(No. 42477.—

*In re* ROBERT AGIN, Attorney, Respondent.

*Opinion filed March 24, 1970.*

JOHN CADWALDER MENK, of Chicago, *amicus curiae.*

ANTHONY F. MANNINA, of Downers Grove, (HARRY G. FINS, of counsel,) for respondent.

Mr. JUSTICE CREBS delivered the opinion of the court:

The Board of Managers and Committee on Grievances of the Chicago Bar Association, as commissioners of this court under Supreme Court Rule 751 (Ill. Rev. Stat. 1967, ch. 110A, par. 751), filed a report recommending that respondent, Robert Agin, be suspended from the practice of law for a period of one year and until further order of court, on the basis of findings that he had settled a personal injury case without the knowledge or consent of his client and had failed to account for the proceeds until demand was made upon him some two years later.

Respondent's objections to the report contend that the findings are not supported by clear and convincing evidence; that, to the contrary, respondent did account to his client immediately after the settlement, and that the complaint of his client was motivated by an attempt to blackmail him because respondent had caused the insurance company settlement checks to be cashed without his client's endorsement.

Nestor Gomez, the complainant, testified that he was involved in an automobile accident on September 28, 1964, and immediately thereafter hired respondent on a one-third contingent-fee basis, and that four or five months later respondent reported to him that he could settle the case for $1500, but that if they waited longer they could get more. Gomez thought he should get around $3000. He heard nothing more about the case until October 20, 1967, when he received a letter from the Hartford Insurance Company asking verification of the fact that the sum of $1525 had been paid in settlement of his claim and that of his wife and his three minor children. Gomez immediately called respondent who stated that the case was still in court, that he had referred it to another attorney and would check with him. Gomez then obtained numbers and dates of the settle-

ment checks from the insurance company, informed respondent he could prove settlement had been made more than two years before in June of 1965, that he thought his case was worth $3000 and he wanted that amount or he would complain to the bar association. He said respondent first offered him $1000, then $1500 but he refused.

On November 28, 1967, Gomez went to see Charles H. Botkin, assistant chief special agent of the American Insurance Association, where he and Mrs. Gomez signed affidavits of forgery against respondent. On the following day Botkin took Gomez to the office of the Chicago Bar Association where his story was repeated to Leonard Johnson, staff investigator for the Bar Association. The next day, November 30, Gomez met Botkin and Johnson in the lobby of respondent's office building and they waited in the hall while he went in to meet respondent. At that time, Gomez said, respondent gave him $1950 in cash and a note for $1050 dated November 30, 1967. In addition, respondent wrote and signed a promise to pay Gomez's doctor's bill of $305. In return Gomez signed a receipt for $900 dated November 30, 1967, and one for $1050 dated June 21, 1965. In addition, he signed a power of attorney which was undated and authorized respondent to sign releases and checks on behalf of Gomez relative to a settlement of his case.

When Gomez left respondent's office he met Botkin and Johnson in the hall, showed Botkin the note and the promise to pay the doctor, and then the three of them went to the Central National Bank where, in their presence, the sum of $1950 in cash was counted and deposited to Gomez's account. Gomez further testified that sometime later, on separate occasions, respondent paid him $100 and $500 in cash to be applied on the note.

Botkin and Johnson, testifying for complainant, supported him in his testimony as to when they met him, how they accompanied him to respondent's office building, waited for him about 20 minutes, saw the documents he brought

out in his brief case, and watched the teller count the $1950 and deposit it to Gomez's account. Johnson also testified that he examined the brief case carried by Gomez before he entered respondent's office and found it empty, but stated that he had not searched Gomez's person. A representative of the bank verified the fact that the cash deposit had been made.

The respondent testified that he had referred the case to a fellow attorney, Herbert J. Baker; that Gomez called him in May, 1965, and asked him to settle the case for $1500 because he was having domestic difficulties; that the case was settled in June, 1965, and that he, respondent, gave Gomez $1050 in cash and had Gomez sign a settlement statement or receipt dated June 21, 1965. (This is the same receipt Gomez testified that he signed on November 30, 1967.) Respondent further stated that he didn't hear again from Gomez until October 1967, when Gomez told him he had found out his name had been forged on the settlement checks and that unless he gave him an additional $2000 he would report the matter to the bar association and the corporation counsel's office where respondent was then employed. Respondent said he was intimidated, that though he had already paid Gomez the entire settlement proceeds, less his fee, it would be cheaper in the long run to allow himself to be held up rather than suffer the injury that might occur to his character and reputation. Respondent admitted that on November 30, 1967, he signed a note to Gomez for $1050 and a promise to pay his doctor's bill, and that he had Gomez sign an undated power of attorney, stating that he thought the latter document would protect him from any further harassment about the fact that the settlement checks had not been signed by Gomez. He denied giving Gomez $1950 on November 30, stating it was only $900, as shown on the receipt. He also denied that the receipt for $1050 was signed on November 30, but that it had been signed on June 21, 1965, the date he had made his original settlement with Gomez. He said further that the reason he gave Gomez cash

on all occasions was that Gomez wanted it that way, and that part of the cash given to Gomez on November 30 was obtained from Herbert J. Baker. He stated he considered this a loan but he had not repaid it.

Herbert J. Baker testified that he obtained the Gomez case from respondent on referral; that he negotiated a settlement on June 4, 1965 for $1525; that he received five individual checks in varying amounts made out to Gomez, his wife and three minor children; that he signed their names and his own, cashed them at a currency exchange and turned over the entire sum in cash to respondent, receiving in return $225 or $250 as his fee. He further stated that later in June he saw Gomez in respondent's office, which was in the same building as his, that it was during the day but he didn't know what time, that he saw respondent pay Gomez some money, but he didn't know how much, that he didn't think anyone else was present, and anyhow, he didn't think he spent any more than five seconds putting his head in and out of the room.

Respondent argues that he was a young and inexperienced attorney and that he was guilty of no wrong except indiscretion in allowing himself to be blackmailed. He contends that the commissioners' findings of fact are not adequately supported. He also relies upon the principle that in a disbarment proceeding an accused is presumed to be innocent until proved guilty and that evidence should be resolved upon a theory of innocence where reasonably possible to do so. We agree with these principles and have previously so stated. (*In re Damisch,* 38 Ill.2d 195; *In re Donaghy,* 393 Ill. 621; *People* v. *Bentley,* 357 Ill. 82.) But contrariwise, neither the commissioners nor this court are required to be naive or impractical in appraising an attorney's conduct. *In re Krasner,* 32 Ill.2d 121.

We find that the commissioners' findings of fact are fully supported by the evidence. Respondent was admitted to the bar of this State in 1958. He was 34 years of age at

the time of this occurrence, had been engaged in private practice, worked as a claims adjuster for three different casualty companies, was employed as a staff attorney for house counsel of another insurance company defending personal injury claims and was an attorney for the corporation counsel's office of the city of Chicago in the torts division. In the light of his experience, and particularly in view of his knowledge of Gomez's domestic trouble, it is incredible that he would have authorized settlement of this case and directed cashing of the settlement checks without written authority of his client, and then that he would have accepted cash from his fellow attorney and paid cash to his client. Even more incredible is respondent's version of the events two years later when it is contrasted with complainant's testimony, which was fully supported by two independent investigators who saw the documents then prepared by respondent and observed the counting of $1950 in cash which complainant brought forth from respondent's office. Under the circumstances, it is an imposition on one's intelligence to ask that respondent's explanation be accepted, *i.e.,* that he gave complainant only $900 which would mean that Gomez brought $1050 of his own money with him so that the sum observed by the investigators would total $1950; that he had the undated power of attorney signed only to protect himself in the future; and that he did not then predate the receipt for $1050 solely for the purpose of supporting an alleged previous payment.

The only other evidence offered by respondent was the testimony of the attorney to whom he referred the case, who settled it, and who signed complainant's name to the checks and cashed them. This testimony lends no credence to respondent's story whatsoever, as it is so colored, so indecisive, so vague, and so indefinite as to engender nothing but disbelief.

Nor do respondent's two references to claimed impeachment of complainant bear any weight. One statement as to

132

whether Gomez gave his wife part of the money was fully clarified in subsequent testimony, and the other, relating to whether Gomez had told the investigators he intended to ask respondent for $3000, is irrelevant.

Finally, respondent requests that we give consideration to reducing the penalty recommended by the commissioners. We have done so. We have noted the testimony of his character witnesses, the fact that he has a family dependent upon him, and the fact that the pending charge appears to be an isolated one. Nonetheless, in view of the seriousness of the misconduct involved we believe stern discipline is warranted and we conclude that respondent should be suspended from the practice of law for one year.

*Respondent suspended.*