(No. 61971.—

*In re* JAMES K. YOUNG, Attorney, Respondent.

*Opinion filed January 23, 1986.*

Bridget Armstrong, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

James K. Young, of Addison, *pro se.*

JUSTICE MORAN delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission filed a complaint charging re-

spondent, James K. Young, with professional misconduct. The one-count complaint charged respondent with commingling and converting client funds, failing to promptly pay or deliver client funds in his possession, engaging in conduct involving fraud, deceit and misrepresentation, and prejudicing and damaging a client during the course of a professional relationship. The Hearing Board found that respondent commingled client funds and recommended that he be censured. The Administrator filed exceptions to the report and recommendation of the Hearing Board. The Review Board, without opinion, affirmed the Hearing Board's findings and recommendations. One member of the Review Board dissented and recommended that respondent be suspended from the practice of law for one year. The Administrator has filed exceptions in this court pursuant to Rule 753(e)(6). 94 Ill. 2d R. 753(e)(6).

We have been asked to determine what, if any, sanctions should be imposed under the circumstances of this case.

In February 1981, respondent was retained by Larry and Beverly Peckous to represent them in the sale of their Villa Park, Illinois, home. Prior to closing, respondent discovered that a trust deed relating to a second mortgage on the home was listed as a title exception on the title insurance report, though the loan secured by the trust deed recently had been paid in full. The Peckouses had given the note and trust deed to Household Finance Corporation (HFC) in 1979 in exchange for the loan. Respondent informed the Peckouses that they would need to produce, among other things, the cancelled note from HFC in order to close the sale of their home.

The cancelled note was not produced at the closing on February 20, 1981, and it was agreed that respondent would hold $3,209.04 in escrow until title was cleared.

The purchaser presented respondent with a check for $4,890.95, which included the $3,209.04 that was to be held by respondent in escrow pending the title clearance. Respondent endorsed the check, and the next day, he deposited $3,590.95—including the $3,209.04 in escrow funds—into his account at the Main Bank of Lombard. The account was neither a clients' trust account nor an escrow account. Respondent testified that he used the account as a personal business account. He admitted, however, that on occasion he had deposited clients' personal injury settlement checks into the account. He further testified that he closed his clients' trust account in 1979 because he was "winding down" his law practice.

Soon thereafter the balance in the account fell below $3,209.04. On March 6, 1981, the balance in the account was $935.94. The balance was less than $3,209.04 several times during the next 15 months. In addition, the record reveals that the account was overdrawn on June 6, 1982.

On March 10, 1981, respondent wrote a letter to HFC on behalf of his clients requesting that the company forward the cancelled note and an executed release deed. An HFC officer informed respondent that the note was lost. Thereafter, HFC notified Chicago Title & Trust Company (Chicago Title), the trustee, that the note had been paid in full but was lost and it directed Chicago Title to issue the release deed. The release deed was subsequently issued, and it was recorded on May 6, 1981.

Beverly Peckous testified that she and her husband contacted respondent several times between February and October 1981 concerning the money held in escrow. Respondent told them that Pioneer National Title Insurance Company (Pioneer Title), which had issued the title insurance policy on their former residence, was still unwilling to waive the second mortgage as a title exception, because the Peckouses could not produce the can-

celled note. He also told them that he was unwilling to return the funds held in escrow to them until Pioneer Title waived the title exception as per the escrow agreement.

Respondent testified that his initial efforts to have the title exception waived were unsuccessful. He testified that Pioneer Title was unwilling to waive the title exception without the cancelled note because the missing note was a negotiable instrument. Thereafter, on April 16, 1982, the Peckouses retained attorney Philip L. Bateman to help them obtain return of the funds held by respondent. Bateman contacted respondent and requested return of the money. Respondent refused to return the money to the Peckouses until the title exception was waived. However, in a letter dated April 26, 1982, respondent offered to deposit the money with Bateman "or a third party upon a release from the parties ***." He also informed Bateman that Pioneer Title was willing to waive the exception "upon deposit [by the Peckouses] of one hundred seventy percent of the amount of the original note and only after the expiration of the statute of limitations." Respondent testified that Bateman never responded to his offer to deposit the money with a third party. Bateman then advised the Peckouses to file a complaint with the Commission. The complaint was filed on June 25, 1982.

Subsequently, on July 23, 1982, Pioneer Title agreed to waive the title exception. On July 28, 1982, respondent had a cashier's check for $4,400 issued to the Peckouses. Respondent testified that the $4,400 represented the amount held in escrow, interest and attorney fees.

The Hearing Board's finding that respondent commingled client funds with his own is undisputed. We also agree with the Administrator that there was clear and convincing evidence to support a finding that respondent converted the escrow funds. Respondent's account fell

below $3,209.04 numerous times in the 16-month period following the February 1981 house closing, and the account was overdrawn on at least one occasion during the same period. This evidence establishes a finding of conversion. See, *e.g., In re Kramer* (1982), 92 Ill. 2d 305; *In re Freel* (1982), 89 Ill. 2d 263, 269; *In re Clayter* (1980), 78 Ill. 2d 276, 282-83.

This court has consistently condemned the conduct engaged in by respondent. It has held repeatedly that the commingling of client funds is not to be countenanced. (See, *e.g., In re McLennon* (1982), 93 Ill. 2d 215, 221; *In re Freel* (1982), 89 Ill. 2d 263, 270; *In re Lingle* (1963), 27 Ill. 2d 459, 463-64; *People ex rel. Chicago Bar Association v. Hachtman* (1932), 350 Ill. 326, 329-30.) Even when the mistake is an honest one and the attorney intends to return the money, he jeopardizes the security of his client's money by commingling it with his own. As the court in *In re Clayter* (1980), 78 Ill. 2d 276, observed:

> "The commingling of funds and depositing clients' funds or other money held by an attorney for another in an account standing in the attorney's name alone endangers the security of the interests of those to whom the money belongs. Commingling of funds has been the first step in a large number of cases which this court has considered involving wrongful conversion of funds by attorneys. Also, when funds belonging to another are deposited in an attorney's personal account, there is the danger of the conversion of these funds by operation of law; that is, in case of the death or insolvency of an attorney, these funds could well become assets of his estate, leaving the rightful owner with only a claim of a creditor against the attorney's estate. For these reasons, it is essential that such money be held in such a manner that there can be no doubt that the attorney is holding it only for another and that the money does not belong to him personally." 78 Ill. 2d 276, 281.

Attorneys who have been found guilty of commingling and converting client funds have received sanctions ranging from censure to disbarment. (*In re McLennon* (1982), 93 Ill. 2d 215, 221.) In determining the sanction to be imposed, it must be remembered that each case is unique and it must be judged according to its own particular circumstances. (*In re O'Hallaren* (1976), 64 Ill. 2d 426, 433.) However, "where the facts are similar to those in other cases, a uniform standard of discipline should be sought." *In re Feldman* (1982), 89 Ill. 2d 7, 11. See also *In re Enstrom* (1984), 104 Ill. 2d 410, 416; *In re Woldman* (1983), 98 Ill. 2d 248, 257-58.

In *In re Clayter,* respondent represented the seller in the sale of a house. The purchasers paid $1,000 as earnest money, which was deposited and held by respondent. He thereafter deposited the earnest money into a personal business account instead of placing the money in an escrow or clients' trust account. Moreover, the balance in the account dropped below $1,000 on several occasions. A dispute arose as to the earnest money, and respondent eventually filed an interpleader action and deposited the money with the court. In determining that censure was the appropriate sanction, the court found important several mitigating circumstances: the record was devoid of any evidence showing that respondent had a dishonest motive; there was a *bona fide* dispute over who was entitled to the earnest money; respondent had practiced law for almost 20 years with no other complaints of ethical infractions; he had an outstanding record of involvement in community service programs, and there was testimony as to respondent's good reputation.

In the present case the Hearing Board concluded that respondent did not have a dishonest motive; that there was a *bona fide* title problem with respect to his client's property which justified his retention of the money; and that respondent had sufficient other assets to repay the

money to his clients. These findings, which were approved by the Review Board, are supported by clear and convincing evidence. Moreover, the record shows that respondent was candid with the Hearing Board and exhibited a repentant attitude. The record also reveals that respondent practiced law for almost 20 years without a prior complaint concerning his representation of a client; that he has a good reputation in the community; and that he has engaged in many civic and community activities and provided considerable *pro bono* work to charitable organizations. Finally, respondent has stated that he no longer maintains an active law practice but only performs a small amount of legal work in connection with his position as a vice-president of a security-guard company. Under the circumstances, we think this case is like *In re Clayter* (1980), 78 Ill. 2d 276, and other cases where the court has concluded that censure is the appropriate sanction. (See, *e.g., In re Enstrom* (1984), 104 Ill. 2d 410; *In re McLennon* (1982), 93 Ill. 2d 215; *In re Sherman* (1975), 60 Ill. 2d 590.) Accordingly, it is ordered that respondent be censured.

*Respondent censured.*