(No. 64333.—■■■■■■■■)

*In re* HARVEY LEONARD WALNER, Attorney, Respondent.

*Opinion filed February 11, 1988.*

Thomas P. Sukowicz, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Don H. Reuben, Robert W. Tarun and Alan J. Mandel, of Isham, Lincoln & Beale, of Chicago, for respondent.

JUSTICE MILLER delivered the opinion of the court:

On January 21, 1985, the Administrator of the Attorney Registration and Disciplinary Commission filed a two-count complaint charging the respondent, Harvey Leonard Walner, with professional misconduct in connec-

tion with settlements he made in two personal injury cases. A panel of the Hearing Board found that the respondent acted improperly in one case but not in the other and recommended that he be censured. Both the Administrator and the respondent filed exceptions to the Hearing Board's report and recommendation. The Review Board found that the respondent's conduct in both cases was improper and recommended that he be suspended from the practice of law for one year. The respondent has filed exceptions to the Review Board's recommendation. See 107 Ill. 2d R. 753(e)(5).

For the most part, the facts in this case are not in dispute. The parties submitted to the Hearing Board an extensive stipulation concerning the activity at issue here, and the summary that follows is based largely on the stipulation. Count I of the Administrator's complaint grew out of the respondent's representation of a client, Michael Jordan, in a personal injury action. Jordan, two of his cousins, Perry Hale and John Miller, and a friend, Alton Childs, were involved in an automobile accident in Chicago on November 2, 1975. All four retained the respondent's law firm, Harvey L. Walner & Associates, Ltd., to represent them in the matter on a contingent-fee basis. The attorney-client agreement signed by each one contained the provision, "It is further agreed that no settlement will be made without the consent of the injured party."

Initial attempts to settle the claims failed, and the respondent's law firm filed suit on behalf of the four in February 1977. In January 1978, the firm was unable to locate Jordan and wrote to the other plaintiffs seeking their help; by that time Jordan had moved from Chicago to Minneapolis, and the office did not have a record of the new address. On January 26, Jordan went to the firm's office to sign his responses to interrogatories submitted by the defendant; it is not clear from the record

how contact with Jordan had been made. The next apparent contact with Jordan came more than two years later, in March 1980, when the firm wrote to Jordan at his Minneapolis address to tell him of the scheduling of his deposition. Jordan responded to the letter, and he gave the deposition in Chicago on July 3, 1980.

The case was set for a pretrial conference in July 1981. At that time, the respondent's firm presented the special damages and demand of each client, and the defendant made a settlement offer for each of the four claims. Jordan's special damages were $210, he was demanding $1,000, and the defendant offered $400; the special damages, demands, and offers for the three others were all greater than Jordan's. At the conclusion of the conference, the trial judge recommended that each of the offers be accepted. Brian Higgins, the attorney handling the matter for the respondent's firm, relayed the offers to plaintiff Alton Childs, and at some point Childs told Higgins that the four plaintiffs would accept the offers. On September 15, 1981, Childs called Higgins and said that the plaintiffs had decided to reject the settlement offers. Childs called back later that day, however, to say that they would accept the offers. By that date, Jordan had moved from Minnesota to California; the firm's records did not indicate his new address. Higgins' note of the two telephone calls says, "Alton Childs called says P's changed minds re settlement want trial—called back again in afternoon says OK to settle. OK to settle at pretrial." On September 16, the respondent's firm informed defense counsel that the plaintiffs had accepted the settlement offers, and the trial judge dismissed the action later that day.

Defense counsel sent to the respondent's firm releases to be signed by the four plaintiffs, and Childs, Hale, and Miller signed theirs at the respondent's office early in October. Neither the firm nor a private investi-

gator was able to reach Jordan, however, and on October 8, an employee of the firm, in accordance with the respondent's instructions, affixed Jordan's signature to the release of his claim. There was no indication that the signature was made by anyone other than Jordan, and it was notarized by one of the respondent's employees.

The respondent's firm received the four settlement checks in January 1982. Childs, Hale, and Miller went to the office, signed closing statements, endorsed the settlement checks, and received their shares of the proceeds. Jordan could not be located, so the law firm held the draft and again hired an investigator to look for him. Late in April, the firm learned from the defendant's insurer that Jordan's settlement draft would still be honored even though it was already three months old. On May 7, 1982, an employee of the firm, acting under the respondent's direction, affixed Jordan's endorsement to the draft, and it was then deposited in the firm's general business account. Later that day, a check for $133.33, representing the amount determined to be Jordan's share of the $400 settlement, was drawn on the general account and deposited in the firm's escrow account. Several days later, the respondent paid $133.33 from the general account to Jordan's doctor in satisfaction of a medical lien and retained the remaining sum, $133.34, in the general account as attorney fees; the medical and legal fees represented voluntary reductions of the amounts actually due.

In December 1982, Jordan contacted the respondent's firm about his case. Jordan wrote, "I would like to know if the case was settled out of court. If so, I would like for you to send my part of the settlement to ***." The firm responded to the inquiry in February 1983. On August 5, 1983, the firm mailed Jordan settlement papers to sign. Jordan did not sign and return the papers, and at the time of the disciplinary hearing the respondent

still held Jordan's settlement proceeds in the firm's escrow account. Neither the respondent nor the Administrator was able to locate Jordan after August 5, 1983.

Count II of the Administrator's complaint involved the case of Frances Cuevas and Julio Feliciano, who retained the respondent's firm on a contingent-fee basis on March 2, 1979, to handle claims arising from an automobile accident that had occurred in Chicago earlier that day. The attorney-client agreements signed by Cuevas and Feliciano granted the firm a general power of attorney, which provided, "It is further agreed that I (we) give the said attorneys full power and authority to do and perform all and every act and thing whatsoever including executing drafts and releases requisite and necessary to be done in and about the claim as fully, to all intents and purposes, as might or could do if personally present at the doing thereof."

About five months later, the respondent's firm received a letter dated August 9, 1979, from the insurance carrier of the owner of the other vehicle involved in the accident. The letter expressed the insurance company's desire to have the matter resolved quickly, and it concluded, "Time is of the essence in this settlement and we will therefore expect to hear from you in fifteen days after receipt of this letter as to the specific medical and special damage facts." That information was relayed to the company in a letter from the respondent on October 25, 1979; Cuevas's special damages were $185, and Feliciano's were $589.50. About two weeks later, the insurer offered to settle the two claims for $600 and $950 respectively. After reviewing the settlement offer, the respondent told the insurer to send him the releases and settlement checks. Those documents were received on November 30, 1979; office staff then tried to call Cuevas and Feliciano and learned that their lines had been disconnected. Post cards and telegrams later were sent to

the clients' last known addresses to advise them of the proposed settlements; as of December 12, 1979, the firm had received no communication from the two regarding the settlement. Apparently they had moved and had not left forwarding addresses, and on February 20, 1980, an investigator reported that he could not find them.

On February 25, 1980, an employee of the firm, acting at the respondent's direction, affixed the signatures of Cuevas and Feliciano to the releases; also at the respondent's direction, two other employees signed the releases as witnesses to the signatures. Nothing on the documents indicated that the clients' signatures were made in a representative capacity. On the same day, an employee of the firm, acting under the respondent's direction, affixed the endorsements of Cuevas and Feliciano to the settlement drafts. The drafts were then deposited in the firm's escrow account, and the respondent withdrew $560.17 from that account to pay both his fees and costs advanced by the firm with respect to the two claims.

On May 27, 1983, Cuevas and Feliciano contacted the firm regarding their claims, and on May 31, they signed closing statements and received their shares of the settlement proceeds. Testifying before the Hearing Board, Cuevas said that she had called the respondent's office twice to inform the staff of her new address; the respondent's office had no record of the calls.

In each count of the complaint, the Administrator charged the respondent with illegal conduct involving moral turpitude (107 Ill. 2d R. 1—102(a)(3)), conduct involving dishonesty, fraud, deceit, or misrepresentation (107 Ill. 2d R. 1—102(a)(4)), failure to obtain the consent of a client on a closing statement within a reasonable time after receipt of funds (107 Ill. 2d R. 2—106(c)(3)), failure to promptly notify a client of the receipt of funds (107 Ill. 2d R. 9—102(c)(1)), failure to promptly pay or

deliver funds to a client (107 Ill. 2d 9—102(c)(4)), withdrawing funds allegedly due a lawyer without reasonable notice to the client (107 Ill. 2d R. 9—102(b)), commingling (107 Ill. 2d R. 9—102(a)), and conversion.

In its report and recommendation, the Hearing Board concluded that the respondent had settled Jordan's claim without his consent and therefore had violated the terms of the attorney-client agreement signed by Jordan. Addressing the purported acceptance by Childs of the offers on behalf of all four plaintiffs in the case, the Board noted that the record was silent whether Childs in fact had authority to speak for Jordan, and the Board doubted whether that authority existed, for Childs did not know where Jordan was. The Hearing Board also concluded that the respondent was without authority to affix Jordan's signature to the release and settlement draft and expressed the view that the respondent "took pains to make it appear that the signature was indeed that of Jordan." The Board believed that the respondent was guilty of conduct involving fraud, dishonesty, deceit, or misrepresentation; the Board did not find that the respondent's conduct was illegal. Citing the eight-month delay between Jordan's call to the respondent's office in December 1982 and the transmittal to him of a closing statement in August 1983, the Hearing Board found that the respondent had failed to provide Jordan with a timely closing statement and had failed to promptly notify him of the receipt of his funds, violations of Disciplinary Rules 2—106(c)(3) and 9—102(c)(1).

With respect to the charges in count II of the complaint, concerning the representation of Cuevas and Feliciano, the Hearing Board believed that the respondent's conduct was consistent with the general power of attorney set out in the attorney-client agreements signed by them, and therefore the Board concluded that the respondent had the authority to execute the releases and

drafts in settlement of their claims. The Board was troubled, however, by the firm's failure to indicate on those documents that the clients' signatures were made in a representative capacity.

With respect to both counts, the Board believed that the respondent had committed what it termed a technical violation of Disciplinary Rule 9—102(b), relating to the withdrawal of a fee without providing reasonable notice to the client. In neither count did the Board find evidence to support the Administrator's charges of commingling or conversion of client funds or the failure to make prompt payment of funds to a client. The Board concluded that the respondent was not guilty of unethical conduct under count II and recommended that he be censured in connection with count I.

Both the Administrator and the respondent filed exceptions to the Hearing Board's report and recommendation. The Review Board agreed that the respondent was not guilty under either count of commingling, conversion, or failure to make prompt payment of client funds. With respect to count I, the Review Board agreed with the Hearing Board that the respondent settled Jordan's claim without authority and in violation of the attorney-client agreement. In addition, the Review Board believed that the respondent's conduct in having Jordan's signature affixed to the release and draft, in having it falsely notarized, and in failing to report to either the defendant's insurance company or the court that Jordan's whereabouts were not known was illegal and involved dishonesty, fraud, deceit, or misrepresentation. The Review Board concluded that the respondent acted with the intent to deceive and defraud.

With respect to count II of the complaint, concerning the respondent's handling of the Cuevas and Feliciano claims, the Review Board rejected the respondent's reliance on the power of attorney contained in the fee

agreements signed by those clients. The Board expressed the view that the respondent, if he believed that he was authorized to settle the cases, should have signed the documents in those cases as attorney in fact. The Review Board noted that the disappearance of a client could be the result of death or disability, circumstances that would terminate a power of attorney. The Board said that it seriously questioned the use of powers of attorney in litigation, particularly in the settlement of personal injury cases, and believed that prohibiting their use would be the only way of ensuring that clients are consulted regarding the disposition of their claims and that they receive prompt payment of their proceeds.

A majority of the Review Board recommended that the respondent be suspended for one year; one member was in favor of a six-month suspension, and another member recommended censure.

In this court, the respondent argues that he was authorized, or had reason to believe that he was authorized, to effect the settlements that were reached on behalf of his clients Jordan, Cuevas, and Feliciano. The respondent also contends that his actions in these cases were appropriate responses to the problems that arise when a client cannot be located at a critical juncture in the proceedings. With respect to the manner in which the clients' releases and settlement checks were signed, the respondent freely concedes that his methods of executing the documents were not ideal, but he insists that there was no evidence in any instance that he took an improper profit.

The respondent contends that the settlement of Jordan's claim was authorized by fellow plaintiff Childs, whose telephone call on September 15, 1981, indicated that all the plaintiffs had agreed to the proposed settlements. Also, the respondent notes that Jordan, in a letter to the firm in December 1982, asked whether his

case had been settled and requested his share of the proceeds; according to the respondent, Jordan's inquiry suggests that he had indeed given someone authority to settle his claim.

Although the parties stipulated that Childs communicated with the respondent's firm regarding the settlement of the plaintiffs' claims, his authority to do so is nowhere explained. Nor is it apparent how, or when, Childs assumed the role of spokesman for the others. Although the Administrator did not present testimony from Jordan or Childs to determine whether Childs had authority to act in Jordan's behalf—Jordan apparently could not be located at the time of the proceedings—the respondent's theory is in clear conflict with the terms of the attorney-client agreement signed by Jordan. The agreement expressly provided that "no settlement will be made without the consent of the injured party." In addition, the circumstances surrounding the execution of the settlement documents—simulated signatures, false notarization, and failure to indicate that the signatures were made in a representative capacity—tend to undermine the respondent's assertion that he believed that he was authorized to act on Jordan's behalf. Considering all the evidence in this case, we conclude that the Administrator has proved by clear and convincing evidence, as he is required to do so (see 107 Ill. 2d R. 753(e)(3)), that the respondent lacked the authority to settle Jordan's claim.

The Administrator also charged that the respondent did not promptly notify Jordan of the settlement, provide him with a closing statement, or pay him the proceeds, all in violation of Disciplinary Rules 9—102(c)(1), 2—106(c)(3), and 9—102(c)(4). We agree with the Administrator that the respondent was tardy in performing those duties. Any delay before December 1982, when Jordan wrote to the respondent's firm to inquire about

his case, was excused by Jordan's absence and the respondent's diligent, but futile, efforts to locate him. But once Jordan contacted the respondent in December 1982, the respondent did not inform him of the amount of the settlement or promptly send him the documents needed to close the matter. Even the correspondence sent by the respondent to Jordan in February 1983 did not notify the client of the settlement of the claim. The respondent stated that Jordan contacted his office by telephone several times between December and August and indicated that he would be coming to Chicago to pick up his money. Although the respondent could wait a reasonable time for Jordan to come in, he had a duty to his client to expedite the matter.

The Administrator also charged the respondent with withdrawing his attorney fees without notice to Jordan, a violation of Disciplinary Rule 9—102(b). The Hearing Board found only what it termed a technical violation of the rule. We decline to label it as merely technical. This was not a case of mere oversight. The respondent had not been able to notify his client of the settlement. Until Jordan knew of the settlement and expressed approval of his fee, it was highly improper for the respondent to withdraw his fee. Although the fee in Jordan's case appears to be appropriate, that does not make the violation merely technical. The respondent had a duty to preserve his clients' funds, and this he failed to do.

Finally, we agree with the Hearing Panel and Review Board that there was no proof of commingling or conversion in Jordan's case. The Administrator has produced no evidence to show that the initial deposit of Jordan's settlement check in the firm's general account was anything more than a bookkeeping error. Later that day, the appropriate amount was transferred to the firm's escrow account. The Administrator has not argued that the respondent's premature withdrawal of his fee consti-

tuted commingling or conversion, and we express no view on that question.

With respect to Cuevas and Feliciano, the respondent sufficiently rebutted the charges by producing the powers of attorney signed by the clients; those documents on their face gave the respondent authority to settle for his clients. Although that particular form of power of attorney may be subject to abuse (see *In re Dombrowski* (1978), 71 Ill. 2d 445, 450, 453-54), there is no evidence here that the respondent abused the authority given to him. In fact, his clients later accepted the settlements he had negotiated for them. This court has previously condemned the procurement by attorneys of a general authority to settle, particularly when the attorney is hired on a contingent-fee basis. (*In re Gavin* (1961), 21 Ill. 2d 237, 245.) To prevent any conflict of interest and appearance of impropriety, the respondent should not have attempted to use such an agreement. Any power of attorney should have been narrowly drawn to limit the attorney's power to settle within a certain range of options and for a certain time period.

The Administrator charged that the respondent did not promptly notify Cuevas and Feliciano of the settlements, provide them with closing statements, or pay them the proceeds, all in violation of Disciplinary Rules 9—102(c)(1), 2—106(c)(3), and 9—102(c)(4). We believe that the Administrator's contentions are without merit. The respondent diligently searched for the clients, but to no avail. He exhausted all avenues of information, and we do not believe that he was obligated to renew the search. When the clients finally contacted the respondent, he immediately notified them of the settlements and promptly paid the proceeds to them. We find that respondent's conduct was proper under the circumstances.

The Administrator also charged the respondent with withdrawing his attorney fees without notice to the cli-

ent, a violation of Disciplinary Rule 9—102(b). The Hearing Board found a technical violation of the rule. As in Jordan's case, we again agree that there was a violation, but we decline to label it as merely technical. Finally, there was no evidence presented to support the Administrator's charges of commingling and conversion with respect to Cuevas and Feliciano. As we noted previously, the Administrator has not argued here that the premature withdrawal of an attorney's fee may constitute either commingling or conversion.

The question remains what sanction is appropriate here. The Administrator recommends a suspension of at least one year. The respondent argues that no sanction is warranted and, alternatively, that only censure should be imposed. In the respondent's view, his actions merely reflected poor judgment in trying to protect the interests of his missing clients, and he asserts that no one was harmed by his conduct. Furthermore, the respondent maintains that the law and ethical rules did not provide any guidance on these matters. See *In re Friedman* (1979), 76 Ill. 2d 392.

We do not agree with the respondent's characterization of his activities. The respondent has lost sight of the fact that the duties to represent a client zealously and competently are qualified by the requirement that he act within the bounds of the law. (See 107 Ill. 2d R. 7—102.) Moreover, the case law and ethical rules provided sufficient guidance to the respondent. This court has consistently condemned the activities of settling a claim without a client's consent and of signing a client's name without authority. In *In re Stillo* (1977), 68 Ill. 2d 49, 54, the court said, "For an attorney to settle a personal injury case and direct the cashing of settlement checks without authorization by his client is itself an impropriety requiring discipline. (*In re Agin*, 45 Ill. 2d 126, 131.)" (See also *In re Dombrowski* (1978), 71 Ill. 2d 445, 450; *In re*

*Di Bella* (1974), 58 Ill. 2d 5, 8.) Although those cases generally involved more egregious conduct than what was proved here, they provide ample notice to attorneys that they must have authority before settling or signing on a client's behalf.

The respondent's improper conduct created a substantial risk of harm, though there was no evidence here that anyone was prejudiced by his activities. Moreover, there is no evidence that the respondent acted with a dishonest motive; his conduct seemed to spring instead from a misguided sense of efficiency and was apparently designed to accommodate clients who were difficult to reach. As the respondent told the Hearing Board, he had been in practice for 23 years and this was the first formal complaint that he had been required to answer before the Hearing Board. Absent clear evidence of dishonest motive or economic harm to his clients or others, we believe that censure is the appropriate sanction. (See *In re Levy* (1987), 115 Ill. 2d 395.) In those cases arising from similar conduct in which this court has imposed a greater sanction, the attorney converted funds, acted with a dishonest motive, or disregarded the clear instructions of a client. (See *In re Dombrowski* (1978), 71 Ill. 2d 445; *In re Stillo* (1977), 68 Ill. 2d 49; *In re Di Bella* (1974), 58 Ill. 2d 5; *In re Agin* (1970), 45 Ill. 2d 126.) We find those cases to be inapplicable, and therefore we order the respondent censured.

*Respondent censured.*