(No. 74615.—

*In re* JOSEPH ROSIN, Attorney, Respondent.

*Opinion filed July 22, 1993.—Rehearing
denied October 4, 1993.*

McMORROW, J., took no part.
HEIPLE, J., joined by FREEMAN, J., specially concurring.
MILLER, C.J., dissenting.

Jerome Larkin and Jonathan P. Siner, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Russell J. Hoover, of Jenner & Block, of Chicago, for respondent, and Joseph A. Rosin, respondent *pro se*.

JUSTICE BILANDIC delivered the opinion of the court:

This disciplinary action against respondent, Joseph Rosin, began with a two-count complaint charging that he had commingled and converted client funds, and that he also commingled and converted the interest earned on those funds. The Hearing Board found that respondent had commingled but not converted client funds; however, it did not make any findings and conclusions regarding the interest earned on those funds. The Hearing Board recommended censure. The Review Board found that respondent had commingled client funds, and that he also had converted and commingled the interest earned on those funds. The Review Board recommended censure, conditioned on respondent's paying restitution of $7,374.83 to a former client for interest earned on her funds.

Neither party filed exceptions to the Review Board report. The Administrator then filed a motion with this court to approve and confirm the report and its recommendation. In that motion, the Administrator argued that each finding and legal conclusion of the Review Board was supported by the facts and relevant case law. Moreover,

the Administrator stated that the recommendation of censure was consistent with prior precedent of this court.

This court denied the Administrator's motion to approve and confirm the findings of the Review Board, and ordered that briefs be filed and oral arguments held pursuant to Rule 753(e)(1) (134 Ill. 2d R. 753(e)(1)).

The stipulated facts reveal that respondent was admitted to the Illinois bar in 1950, and engaged in a general practice of law with a concentration in the area of plaintiff personal injury and worker's compensation claims.[1]

Between December 1, 1981, and October 6, 1986, respondent maintained a business firm account at Bank Leumi in Chicago. Upon completion of law cases (by settlement or judgment), the satisfaction or payment was made with an insurance draft payable jointly to the client and respondent. These drafts were usually drawn on out-of-State banks. First, attorney fees and costs were deducted. Next, the client would endorse the insurance draft and simultaneously receive a settlement check for the net proceeds due to the client drawn on respondent's business firm account at Bank Leumi. Usually, the client would present respondent's check to Bank Leumi as soon as it was received.

After the insurance draft was endorsed by the client, respondent would also endorse it and deposit it into the firm business account at Bank Leumi during the regular course of business. Often, clients cashed their checks before respondent deposited the insurance draft.

In the normal course of banking practice, the insurance company draft would require approximately five business days to clear before it was credited to respondent's business firm account. Nevertheless, every client settlement

---

[1]In 1987, this court suspended respondent from the practice of law for two years for his failure to limit business relations with a client and other violations unrelated to the alleged misconduct at issue.

check was honored when presented for payment. All business transactions of the firm were conducted through the firm account. Respondent did not maintain a separate client trust account until 1986, when this court issued its opinion in the case of *In re Elias* (1986), 114 Ill. 2d 321.

On several occasions, the balance in the firm account was less than the amount of an outstanding check issued to a client. The manager of Bank Leumi testified that respondent was a well-regarded customer with a $600,000 line of credit, and that he had arranged to guarantee payment of all checks written against his account regardless of the firm balance. It is undisputed that every settlement check issued by respondent to a client was promptly honored upon presentment, and that no checks were ever dishonored.

On February 1, 1983, the bank began to pay interest on funds deposited into the account. The complaint charged that respondent never informed clients that their funds had earned interest, and that the interest was retained in the firm account. In particular, on January 3, 1983, respondent issued a settlement check in the amount of $162,000 to a client, Penelope Bell, as her portion of the proceeds in a wrongful death action. Bell did not deposit respondent's check into the bank until July 25, 1983. During the seven months that Bell held the settlement check, the bank paid respondent $4,076.73 in interest on those funds.

The Review Board noted that respondent made no effort to notify Bell that interest was earned on the settlement check. According to the Review Board, respondent's failure to reimburse Bell for the interest which accrued during the seven-month period, compounded over the past nine years, resulted in a total obligation to Bell in the amount of $7,374.83. Respondent complied with the condition recommended by the Review Board, and issued a check to Bell for $7,374.83 for the earned interest. In ad-

dition, respondent has paid $5,770.74 to the Lawyers Trust Fund for the interest attributable to the settlement checks.

Mindful of the fact that the alleged misconduct at issue occurred prior to the *Elias* ruling, we now address whether: (1) the overdraft protection agreement between respondent and Bank Leumi precluded respondent from converting client funds; (2) client funds were commingled in the firm account; and (3) respondent commingled and converted the interest earned on client funds.

## I

Conversion has been defined by this court as " 'any unauthorized act, which deprives a man of his property permanently or for an indefinite time.' " (*In re Thebus* (1985), 108 Ill. 2d 255, 259, quoting *Union Stock Yard & Transit Co. v. Mallory, Son & Zimmerman Co.* (1895), 157 Ill. 554, 563.) The essence of an action for conversion is the wrongful deprivation of property from the person entitled to its possession. *Glaser v. Kazak* (1988), 173 Ill. App. 3d 108, 115; *People ex rel. Carey v. Lincoln Towing Service, Inc.* (1977), 54 Ill. App. 3d 61; *Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc.* (1971), 2 Ill. App. 3d 978.

The Review Board found that because respondent maintained a $600,000 line of credit with the bank, client funds in his law firm account were protected and no conversion occurred. We agree.

The statutory law governing commercial paper, as applied to the facts in issue, leads to the unmistakable conclusion that respondent did not convert client funds. (Ill. Rev. Stat. 1989, ch. 26, par. 3—101 *et seq.*) The settlement check issued by respondent is a negotiable instrument, for it contained an order to pay a fixed amount of money on demand to the client at the time it was issued. (Ill. Rev. Stat. 1989, ch. 26, par. 3—104(1)(a).) As set forth in section 3—202(1) of the Uniform Commercial Code, a negotia-

ble instrument payable to order is negotiated by delivery and indorsement. (Ill. Rev. Stat. 1989, ch. 26, par. 3—202(1).) As the maker of the settlement check, respondent's liability was established at the time that he signed it. (Ill. Rev. Stat. 1989, ch. 26, par. 3—401(1).) When respondent signed and delivered the check to the client, he transferred to the client all rights that he had to the funds which were the subject matter of the check. (Ill. Rev. Stat. 1989, ch. 26, par. 3—201(1).) In the event the check was dishonored upon presentment, the client's cause of action against respondent as maker accrued upon the date of issue. (Ill. Rev. Stat. 1989, ch. 26, par. 3—122(1)(b).) Application of the foregoing sections of the Uniform Commercial Code clearly establishes that when respondent issued the settlement check, he was legally bound to transfer possession of specified funds in the firm account to the client, who, in turn, had an enforceable right to those funds.

Assuming, *arguendo*, that the balance in the firm account was less than the stated amount of the check when the client presented it for payment, section 4—401 of the Uniform Commercial Code explicitly provides that a bank may charge against a customer's account any item which is otherwise properly payable from that account even though the charge creates an overdraft. (Ill. Rev. Stat. 1989, ch. 26, par. 4—401(1).) Moreover, section 4—401 was subsequently amended to provide that an item is properly payable if it is authorized by the customer, and is in accordance with any agreement between the customer and the bank. Ill. Rev. Stat. 1991, ch. 26, par. 4—401(a).

The testimony of the bank manager indicated that respondent was a well-regarded customer with a $600,000 line of credit, and had arranged to guarantee payment of all checks written against his account. It is undisputed that no settlement check was ever dishonored by the bank, nor had any client voiced a complaint, experienced delay, or incurred a financial loss as a result of respondent's

banking arrangement. As stated, a wrongful deprivation of property from the person entitled to possession permanently or for an indefinite time is an essential element of a cause of action for conversion. (*In re Thebus* (1985), 108 Ill. 2d 255.) Such wrongful deprivation of property from the client never occurred in this case. Indeed, in the event that the insurance draft had been dishonored when it was presented by respondent, he alone would have shouldered the risk because the client had already received a check guaranteed to be collectible.

## II

We next consider whether respondent commingled client funds in violation of Disciplinary Rule 9—102(a) (107 Ill. 2d R. 9—102(a)). That rule provides in relevant part:

> "All funds of clients paid to a lawyer or law firm, including funds belonging in part to a client and in part presently or potentially to the lawyer or law firm, shall be deposited in one or more separate identifiable trust accounts in a bank or savings and loan association maintained in the State in which the law office is situated." 107 Ill. 2d R. 9—102(a).

The Administrator attempts to draw an analogy between the respondent's practice as outlined above, and the sanctioned misconduct in the *Elias* case. (*In re Elias*, 114 Ill. 2d at 327.) However, we consider *Elias* factually distinguishable from the present case. In *Elias*, when a check was received in settlement of a client's personal injury claim, it was deposited into one of six bank accounts maintained by the respondent. In turn, the respondent issued a current or post-dated check to the client representing the client's share of the settlement check. However, these checks were not guaranteed upon presentment. The check given the client was drawn on one of the six named accounts, but not necessarily on the account into which the insurance draft had been deposited. On at least eight occa-

sions, the issued check was dishonored due to insufficient funds when presented for payment. Most of the checks were paid upon representment, although two checks were dishonored upon second presentment. In short, Elias knowingly and under false pretenses obtained the short-term use of large sums of money belonging to clients to finance his personal and business activities.

Admittedly, respondent may have technically been in violation of Disciplinary Rule 9—102(a) because he did not have a separate, identifiable trust account. However, the alleged misconduct at issue predated the *Elias* decision. After the *Elias* holding expressly clarified that it is mandatory for an attorney to establish and maintain a separate, identifiable trust account into which any and all client funds are to be deposited regardless of the manner in which an attorney chooses to handle final disbursement of the funds, respondent voluntarily modified his banking practices and established a separate client trust account. Most importantly, in contrast to *Elias*, we note the absence of any client complaints that money was lost or that clients experienced delay in obtaining money as a result of respondent's practice. Simply stated, the settlement practice employed by respondent accomplished the same result as if a separate client trust account had been maintained.

### III

Finally, we consider whether respondent commingled and converted the interest earned on client funds. Penelope Bell held the $162,000 settlement check issued by respondent for a period of seven months. The Board recommended that respondent pay Bell $7,374.83 as restitution for the initial interest payment and subsequent accrued interest, which respondent has voluntarily paid.

We find, however, that it was unnecessary for respondent to have reimbursed Bell for the interest earnings. Bell was not entitled to that interest because she could have

deposited the check from the moment that she first received it. As stated, respondent's settlement check was immediately collectible and payment was guaranteed from the day it was issued and for every day thereafter. The fact that Bell would delay in negotiating the $162,000 settlement check for seven months after the insurance drafts had been collected was an unpredictable occurrence which respondent neither intended nor controlled. Respondent should not incur the penalty of having to pay interest on these funds simply because a client chose not to cash her check for seven months.

For the foregoing reasons, the charges contained in counts I and II are dismissed.

*Dismissed.*

JUSTICE McMORROW took no part in the consideration or decision of this case.

JUSTICE HEIPLE, specially concurring:

I join fully the thoughtful opinion of the court in this lawyer discipline case. Although attorney Rosin was willing to accept a finding of censure and did not ask that the charges be dropped in their entirety, the majority quite appropriately rules in this fashion *sua sponte* and tailors the result as justice requires.

I write to clarify the true issue on appeal. At issue is not whether a separate client trust fund was required before *In re Elias* (1986), 114 Ill. 2d 321, as suggested by the dissenting justice (156 Ill. 2d at 213-14). As the dissenting justice notes, Rule 9—102(a) has required such an account since 1980, and this court's recognition of the obligation to maintain the separate identity of client funds was expressed as early as 1932.

Instead, this case presents the more subtle issue of the extent of a client's interest in a settlement draft after he exchanged it for a law firm check which the lawyer knew

would be honored upon presentment. All parties agree that, had that client received cash, a bank draft or a money order in exchange for the settlement draft, he would have retained no interest whatsoever in the settlement draft. Rosin made a fair inference that exchanging a check that he knew would be honored likewise rendered his client with no interest in the settlement draft.

Thus, the significance of *Elias* is not the clarification of the need for a separate client trust account. It is the clarification that such a check does not divest the client of all his interest in the settlement draft. Once this clarification was handed down by this court, attorney Rosin voluntarily ceased his payment method and adopted the trust fund approach. He did this despite the fact that *Elias* was arguably not on point. As the majority notes (156 Ill. 2d at 208-09), *Elias* can be distinguished because of the lack of safeguards used by Elias as well as the knowing use of false pretenses, factors not present in the instant case.

In short, Rosin is entirely blameless. The worst that can be said is that he came to a different conclusion than this court regarding his clients' interests in settlement drafts exchanged for checks which he knew would be honored, a conclusion that can hardly be defined as unreasonable. And as already noted, once this court's conclusion to the contrary was articulated, Rosin deferred.

Moreover, it should be noted that Rosin's method of settlement with his clients was calculated to benefit the client, not Rosin. He could have deposited the insurance settlement draft into a trust fund account and then waited a week or 10 days for it to clear and then settle up with the client. Instead of doing that, Rosin, in effect, advanced his own money so that the client could have his settlement without delay. The alleged infractions hurt nobody, had no potential to hurt anybody, and were performed with a manifest intent to further the clients' interests as well as comply with the law. His actions did not threaten the in-

tegrity of the profession or the parties' interests, and they were performed before this court indicated that they might be improper.

Accordingly, I agree that the appropriate disposition in this case is to dismiss all the charges against Mr. Rosin without blemish to his reputation for integrity and fair dealing.

JUSTICE FREEMAN joins in this special concurrence.

CHIEF JUSTICE MILLER, dissenting:

The respondent, Joseph Rosin, was charged in a two-count complaint with commingling and converting client funds (count I) and commingling and converting interest earned on client funds (count II). The majority dismisses both counts, finding the evidence of the respondent's wrongdoing insufficient to sustain the charges against him. Unlike the majority, I believe that the allegations of the complaint were established by the record in this case, and accordingly I dissent.

The parties' evidence, which was largely stipulated, reveals that the respondent would deposit the proceeds of judgments or settlements in his firm's general business account and issue to his clients checks drawn on that account for the client's share of the award. From time to time the balance in the firm's account would fall below the amount then payable to clients. No check was ever dishonored, however, for a line of credit extended by the bank to the respondent was always more than sufficient to cover any shortfall in the account. On other occasions, clients would not immediately negotiate the checks they had received from the respondent; as a consequence, the law firm's account would be credited with interest attributable to those client funds. These arrangements formed the basis for the charges filed against the respondent.

The majority concludes that the respondent should not be found guilty of commingling client funds with his own funds because the conduct charged here preceded this court's decision in *In re Elias* (1986), 114 Ill. 2d 321. The majority notes that the respondent established a separate client trust account after *Elias* "expressly clarified that it is mandatory for an attorney to establish and maintain" such an account regardless of the manner in which the attorney distributes client funds. (156 Ill. 2d at 209.) The majority further asserts that the respondent's procedures functioned in much the same way as a separate trust account.

Contrary to the majority's view, the rule against commingling client funds was not in need of clarification prior to this court's decision in *Elias*. Disciplinary Rule 9—102(a) of the Code of Professional Responsibility provided, throughout the period relevant here:

> "All funds of clients paid to a lawyer or law firm, including funds belonging in part to a client and in part presently or potentially to the lawyer or law firm, shall be deposited in one or more separate identifiable trust accounts in a bank or savings and loan association maintained in the State in which the law office is situated." 107 Ill. 2d R. 9—102(a).

Rule 9—102(a) took effect on July 1, 1980. Even before that time, however, this court had recognized the obligation of attorneys to maintain the separate identity of client funds. (See, *e.g.*, *People ex rel. Chicago Bar Association v. Hachtman* (1932), 350 Ill. 326; *In re Bloom* (1968), 39 Ill. 2d 250.) Thus, in *In re Clayter* (1980), 78 Ill. 2d 276, a disciplinary matter decided prior to the effective date of the Code of Professional Responsibility, this court took the "opportunity to admonish the bar of this State that it is absolutely impermissible for an attorney to commingle his funds with those of his client or with money he holds as a fiduciary." *Clayter*, 78 Ill. 2d at 278-79.

This court's decision in *Elias* simply reaffirmed these principles, which at that time were expressed by Rule 9—102(a):

> "It is manifest that this provision is mandatory, admitting of no exceptions for any reason. Repeatedly, this court has held that the foregoing provision embodies an unambiguous requirement that an attorney must establish and maintain a separate, identifiable trust account into which any and all funds belonging, in whole or in part, to clients are to be deposited regardless of the manner in which an attorney chooses to handle final disbursement of these funds. *In re Cutrone* (1986), 112 Ill. 2d 261, 268; *In re Enstrom* (1984), 104 Ill. 2d 410, 417-18; *In re Cohen* (1983), 98 Ill. 2d 133, 139." *Elias,* 114 Ill. 2d at 332.

The respondent's practice here of depositing the proceeds of judgments and settlements in his firm's general business account and paying clients their shares of the awards with checks drawn on that account clearly represented commingling. Clients did not receive the cash, bank drafts, or money orders mentioned by the concurring justice, but checks drawn on an account containing both the proceeds of client awards and the law firm's own operating funds. Notably, the respondent makes no challenge to the Hearing Board's and Review Board's determinations that his handling of client funds violated Rule 9—102(a). Given the clear evidence in this case, together with the respondent's acknowledgment that he was in violation of Rule 9—102(a), I would uphold the Hearing Board's and Review Board's determinations that the respondent was guilty of commingling, as alleged in count I of the complaint.

Less clear is the question whether the respondent was guilty of the conversion of client funds during the periods when the balance of the firm's account fell below the amount then belonging to clients. The respondent correctly notes that no client's check was ever dishonored, for

the substantial line of credit extended to the respondent by his bank was more than sufficient to cover any overdrafts that occurred during the time in question. The majority agrees with the respondent that the existence of the line of credit effectively prevented the conversion of any client funds during that period.

Conversion is established upon a showing that the balance in an account in which client funds are being held falls below the amount then belonging to clients. (*In re Cheronis* (1986), 114 Ill. 2d 527, 534-35; *In re Young* (1986), 111 Ill. 2d 98, 102-03.) We have not previously considered, however, the effect of a line of credit, or other form of overdraft protection, on the operation of that general rule.

In light of the respondent's practice of immediately remitting to a client the client's share of a judgment or settlement, the balance of the respondent's business account might have innocently fallen below the total amount belonging to clients if a client happened to present his check for payment before the respondent's bank had collected the proceeds of that particular award. In certain instances, however, it appears that the account balance fell below the necessary level even after the proceeds of an award had been collected by the respondent's bank. Applying the principle that conversion occurs once the balance in the account falls below the amount of client funds being held in the account, one must conclude that conversion occurred at least on those occasions. Although the line of credit extended to the respondent by his bank would have protected clients against any loss when the respondent's commingled account was overdrawn, the line of credit would not have prevented conversion from occurring in the first instance. Of course, termination of the line of credit, for whatever reason, would have placed those client funds in jeopardy. See *In re Clayter* (1980), 78 Ill. 2d 276, 281.

Count II of the complaint charged the respondent with the commingling and conversion of interest earned on client funds in his possession. The majority concludes that the respondent is not guilty of these charges. Addressing only the case of client Penelope Bell, who waited seven months to deposit a $162,000 check issued by the respondent, the majority believes that Bell was not entitled to the interest earned on that sum because she could have immediately negotiated her check yet chose not to do so. The majority emphasizes that the respondent had no role in determining when Bell finally decided to negotiate the check.

The Review Board properly found the respondent guilty of the commingling and conversion of interest earned on client funds deposited in the law firm's general business account. It is no answer to say, as the majority does, that a client must forfeit whatever right he might have to interest earned on his funds simply because he fails to immediately negotiate a check issued to him. The respondent should not have commingled client funds with his own funds in the first place, and certainly he could gain no greater right to the interest earned on client funds through that arrangement than if he had initially placed those funds in a separate trust account. Attorneys do not somehow become entitled to retain for their own use interest earned on client funds merely by commingling them with their own funds, as the respondent did here. In this State, the appropriate beneficiary of interest earned on a client's funds is the individual client himself or the Lawyers Trust Fund of Illinois, as the administrator of the interest on lawyers' trust accounts (IOLTA) program. (See 107 Ill. 2d R. 9–102(d); 134 Ill. 2d Rules 1.15(d), (e).) The record here shows that the respondent's firm retained the interest earned on client funds held on deposit in the firm's account. For these reasons, I believe that the allegations of count II of the complaint were established by the evidence in this case.

The respondent's primary offense was his failure to maintain a separate client trust account. Misconduct of this type creates a substantial risk of harm to clients. (*In re Clayter* (1980), 78 Ill. 2d 276, 281.) The applicable rules are clear and unambiguous, designed to forestall the potential problems that may arise from those activities. Moreover, it may be noted that the respondent was previously suspended from the practice of law for a period of two years, for misconduct unrelated to the present charges. (See *In re Rosin* (1987), 118 Ill. 2d 365.) In the present case, however, the respondent's actions apparently were motivated by nothing more than what might be termed a "misguided sense of efficiency" (*In re Walner* (1988), 119 Ill. 2d 511, 525). Because of the line of credit extended to the respondent by his bank, none of the respondent's clients ever incurred any loss, temporary or permanent, as a consequence of the respondent's commingling and conversion of client funds. In addition, the respondent has made restitution of $7,374.83 to client Bell for the amount of interest earned by the respondent on her award; separately, the respondent has paid the Lawyers Trust Fund of Illinois the sum of $5,770.74, which represents interest earned on other client funds held by the respondent. Like the Hearing Board and the Review Board, I believe that censure is the appropriate sanction here.