569 P.2d 267

**Samuel SHAPIRO, Appellant,**

v.

**BACHE & COMPANY, INC., Henry Bobbe and Mary Jo Bobbe, his wife, and William Coleman and Jane Doe Coleman, his wife, Appellees.**

**No. 1 CA–CIV 2828.**

Court of Appeals of Arizona,
Division 1,
Department B.

June 30, 1977.

Rehearing Denied Aug. 25, 1977.

Review Denied Sept. 22, 1977.

Wilson, McConnell & Moroney, P. C. by William T. Moroney, Phoenix, for appellant.

Streich, Lang, Weeks, Cardon & French by Robert E. B. Allen, Phoenix, for Bache & Co.

Daughton, Feinstein & Wilson by Donald F. Daughton, Phoenix, for Bobbe.

Law Offices of Donald D. Meyers by R. Jeffrey Blankenburg, Phoenix, for Coleman.

## OPINION

WREN, Judge.

The plaintiff-appellant, Samuel Shapiro, has appealed the granting of motions for summary judgment in favor of the various defendants-appellees, Bache & Company, Inc. (Bache), Henry Bobbe and Mary Jo Bobbe (Bobbe) and William Coleman (Coleman).

The issues raised by the pleadings may be summarized generally as follows: The appellant alleged in his complaint that the appellees, as brokers, executed a series of purchases and sales of securities in his account without authority to do so; that the transactions were excessive in number and were intended primarily to generate commission income; and that large losses resulted from the unauthorized transactions.

To this complaint, each of the appellees filed a separate answer, asserting that appellant was precluded relief even if the transactions complained of were unauthorized because (1) appellant failed to provide Bache a timely written notice of his objections to the transactions complained of within the time and in the manner required by paragraph ten of the Customer's Agreement which he signed; (2) appellant failed to unequivocally repudiate the transactions and this, coupled with his continued business dealings with appellees, constituted ratification as a matter of law; and (3) that appellant's conduct throughout the unauthorized transactions amounted to estoppel and laches.

We agree that summary judgment disposition was proper as to the issues of written notice and ratification and therefore do not respond to the defenses of estoppel and laches.

Construing the evidence presented by the appellant on these issues as true, it is as follows:

Since 1959, Shapiro had actively engaged in trading on the stock and commodity markets. Until 1967 he maintained an account for his securities transactions with Merrill Lynch, Pierce, Fenner & Smith, and also was trading in silver commodities through Bache's New York office. In May of 1967, Shapiro, because of his dissatisfaction with the way the account was being handled by Merrill Lynch authorized Bobbe, then a registered representative of Bache, to transfer his account from Merrill Lynch to Bache. Shapiro then executed a standard form Customer Agreement, required to open an account with Bache, and continued to maintain the account until August 1972. Throughout his dealings with Bache the account was handled by Bobbe and Coleman, both of whom were authorized securities brokers registered with the New York Stock Exchange.

The "Customer's Agreement" was the only contract executed by the parties. Paragraph ten of that agreement provided:

"Reports of the execution of orders and statements of my account shall be conclusive if not objected to in writing within five days and ten days, respectively, after transmittal to me by mail or otherwise."

Shapiro acknowledged that Bache mailed to him an accounting of each transaction shortly after the transaction occurred and that he also received monthly statements which detailed all the transactions in his account for the previous month. Moreover, it was established that Shapiro also kept personal ledgers prepared by his secretary.

A confirmation form thus notified Shapiro within a few days after a transaction of the nature of the transaction (i. e. purchase or sale) the name of the stock, the quantity and price of the shares involved and the registered representative who executed the transaction.

It is Shapiro's position that during the time he maintained the account at Bache no securities transactions were to be made without his specific prior approval. However, he testified that there were many transactions which were made without prior approval, and that after each of these unauthorized transactions he would contact Bobbe by telephone and protest. Bobbe's response was to assure Shapiro that he (Shapiro) had nothing to worry about and that Bobbe would "take care of it." Although the complaint alleges unauthorized transactions only during 1969 and 1970, appellant testified that unauthorized transactions occurred as early as December 1967. In fact, he claimed in his deposition that there were unauthorized transactions during 1968, 1969, 1970 and as late as April 28, 1971. He accused the brokerage company of "churning", a term denoting the generation of activity in a customer's account for the primary purpose of creating commission income for the company.

Throughout this entire period, however, he continued to do business in the same manner with Bache through either Bobbe or Coleman, retaining in his account the transactions alleged to be "unauthorized", and admittedly never filed a written complaint or objection as required by the Customer's Agreement.

Additionally, in July, 1969 when Shapiro was requested by Bache to deposit an additional sum of approximately $10,000 as a "margin" in his account, he complied by depositing the required funds. Moreover, when making his margin call, he complained to Bache that "nobody was taking care of [his] account." The account was thereafter turned over to Coleman.

In the language of Shapiro himself, when asked in his deposition if he had ever complained in writing to Bobbe about any of the transactions:

"I did not complain in writing. I complained orally, and every time I complained he assured me that he would straighten everything out. He always assured me, 'Don't worry, I will straighten everything out, everything's going to be all right,' and it never was."

The summarization of the succeeding events is best expressed in Shapiro's opening brief:

"In any case, it is clear that when Bobbe left for New York, the pattern of trading activity in the Appellant's account changed dramatically. For the first 5½ months of 1969, the period when Bobbe handled the account, the Appellant's monthly statements reflect 74 transactions. In the next 5½ months of 1969, except for the single sale of some shares of a Canadian mining stock in July, there were NO transactions in the Appellant's account. No one yet to testify seems to know who the salesman was who handled the sale of the Canadian mining stock in July, but it is clear it was after Bobbe had gone and before Coleman arrived.

"In February, Coleman, apparently in the mistaken belief that he was providing his customer with some form of tax relief, sold and bought virtually all of the securities in Mr. Shapiro's account. None of these transactions were authorized. Since the sale and purchase of each security was made on the same day, Mr. Shapiro was out of, and back into, the same security position with the commissions and losses charged to his account before he was even aware that any transactions had occurred.

"On August 27, 1970, Coleman without authority, sold 600 shares of Itek short in Mr. Shapiro's account. On learning of the sale the following day, Mr. Shapiro promptly called Coleman and repudiated the transaction. Coleman then bought the short position in at a loss of some $1300. Coleman told Mr. Shapiro that his office manager told him that it was his (Coleman's) responsibility to personally

make up the loss to his customer. He never did. Mr. Shapiro had a specific personal aversion to short transactions in securities.

"Coleman later on made two other transactions in Mr. Shapiro's account which were unauthorized. A purchase of Asamera Oil, which resulted in a profit to Appellant, and a purchase of Pennzoil, which resulted in a loss.

"Throughout the course of his dealings with both Bobbe and Coleman, Mr. Shapiro complained to them about the unauthorized trading in his account. He did not at any time, however, make a written complaint, as he was not aware that any such written complaint was appropriate."

It was denied by Bobbe and Coleman that the questioned transactions were unauthorized. However, for the purpose of considering the validity of the court's ruling on the motions, the testimony of Shapiro on this point must be accepted as true.

The meaning of paragraph ten is clear. It was designed to prevent the very thing which has occurred and to which Shapiro now objects. Through it Bache could have supervised the transactions in Shapiro's securities account. An objection to a purchase or sale as reflected in the confirmation and account statements would have provided Bache and its agents, Bobbe and Coleman, with unequivocal notice that unauthorized transactions were being effected. However, it is undisputed that no written objection was ever filed. Instead of doing so, appellant made only periodic oral protestations and continued to trade with the company.

■ Shapiro claims that he was unaware of paragraph ten; that he was under the impression that the Agreement was a typical brokerage contract impliedly controlled by the customs and usages of the brokerage business. He urges also that the language of paragraph ten is ambiguous and indefinite, particularly as to the word "conclusive" urging that it may refer to any number of things such as number of shares, price, size of debit balance or authority of broker to buy or sell. He further attacks

its validity as being a "fine print" provision, citing cases that such provisions are effective only when brought to the attention of the other party. An affidavit filed by him stated in part:

"The document contains 15 numbered paragraphs. None of these paragraphs were ever discussed with me by Mr. Bobbe or by anyone else from Bache & Company. The document was represented to me to be a routine form required of all persons dealing with Bache. Its specific terms were neither disclosed or discussed. Once the document was signed, it was removed forevermore from my presence. I did not receive a copy of the document either at that time or ever."

Such argument must be held to be unavailing. There is nothing in the record to suggest that appellant did not have the knowledge, capacity or opportunity to read the agreement and to understand it. He cannot be heard to complain that he did not understand it. *Hofmann Company v. Meisner*, 17 Ariz.App. 263, 497 P.2d 83 (1972); *Apolito v. Johnson*, 3 Ariz.App. 232, 413 P.2d 291 (1966).

The cases relied upon by Shapiro are inapposite as containing "inconspicuous" clauses, whereas paragraph ten was printed on the same side of the agreement which Shapiro signed and in the same type size as the rest of the document.

Shapiro further points to the provision in the agreement that all transactions "for my account shall be subject to the constitution, rules, regulations, customs and usages . . . of the exchange when executed", and that one such rule (Rule 408 of the New York Stock Exchange Rules: New York Stock Exchange Guide, Section 2408; CCH 1962) prohibits unauthorized trading in a customer's account.

A fortiori then, he urges, since we must assume on this appeal from summary judgment that the transactions were in fact unauthorized it is clear that the contract was breached by the appellees.

Again, such argument cannot fly in the face of the specific requirement in the

agreement as to the proper procedure to protest the unauthorized transactions. We hold that paragraph ten was a valid and binding contract between the parties and that Shapiro did not give the type of notice required to establish the breach. Contractual notice requirements serve an obvious and salutary purpose. Paragraph ten was a reasonable provision by which Bache could monitor the transaction being questioned.

Further, we hold that under the undisputed facts, and as a matter of law, Shapiro ratified the unauthorized transactions. He readily admitted that his protests always resulted in explanations and reassurances from his brokers in which he acquiesced, and that he continued to deal with them. Shapiro however, points to his continued objections and the fact that ratification of one unauthorized contract is not necessarily a ratification of all; pointing to the simultaneous sale and purchase of Shapiro's entire securities position and the short sale of Itek, repudiated the following day when Shapiro complained to Coleman. Such an argument misses the mark. As to each unauthorized sale Shapiro did not demand immediate sale and restitution.

■ Merely saying that an act was unauthorized does not amount to a repudiation, or prevent a subsequent ratification. Protests which do not clearly and unequivocally disaffirm the unauthorized transactions or demand immediate sale and rectification do not amount to repudiation. See, *Sullivan v. Bennett*, 261 Mich. 232, 246 N.W. 90 (1933); also, *Buck v. Houghtaling*, 110 App.Div. 52, 96 N.Y.S. 1034 (1905); *Leviten v. Bickley, Mandevill & Wimple, Inc.*, 35 F.2d 825 (2d Cir. 1929), wherein the court held that the plaintiff's oral protests to an employee of the brokerage house, suggesting that the purchase was unauthorized, did not constitute a disaffirmance sufficient to avoid ratification.

"The repudiation must not be uncertain or equivocal. . . . 'In order that a repudiation may be effective to preserve the customer's rights it must indicate an intention to disaffirm. It is insufficient if it merely expresses the opinion or as-

sumes the position that the transaction was unauthorized . . . '" *Sullivan v. Bennett*, 246 N.W. at 92.

■ The account representatives at Bache were not ordered by Shapiro to review the unauthorized transactions. For example, in his deposition about the unauthorized purchase of "Sea World" stock the following colloquy occurred.

"Q. After you discovered it, did you have any conversation with Mr. Bobbe or anyone else at Bache respecting the Seaworld stock?

"A. I had conversations with Mr. Bobbe all along about stocks that he bought without my advice or consent and I always got the same answer 'don't worry about it, I'll take care of it.'"

For another example, in connection with "Commonwealth United" stock, appellant testified as follows:

"Q. After you discovered the acquisition of Commonwealth United, did you not instruct them to sell or dispose of the stock—or instruct Bache?

"A. No, for the same reason that I recited before, that Mr. Bobbe had a way of reassuring me that everything was going to be all right— just leave things in his hands.

"Q. So, you—

"A. And, unfortunately, I did."

Shapiro continued to execute transactions through his registered representatives, and to accept repeated notifications of the transactions in question and to pay margin calls on demand, all of which conduct continued for more than three years from the time of the first unauthorized transaction.

Such acts constitute ratification as a matter of law and do not permit recovery here.

Judgment affirmed.

SCHROEDER, P. J., and JACOBSON, J., concur.