MODERN SETTINGS, INC. and Binder and Binder, as attorneys for Modern Settings, Inc., Plaintiffs–Appellees, Cross–Appellants,

v.

PRUDENTIAL–BACHE SECURITIES, INC., and Prudential–Bache Metal Co., Inc., Defendants–Appellants, Cross–Appellees,

Modern Settings, Inc., Bialystock & Bloom Productions Inc. & Co., Counterclaim Defendants–Appellees, Cross–Appellants.

Nos. 1047, 1048, Dockets 90–7831, 90–7833.

United States Court of Appeals, Second Circuit.

Argued Feb. 8, 1991.

Decided May 6, 1991.

Peter A. Jaffe, New York City (Jaffe and Asher, New York City, Ira N. Glauber, Gregory E. Galterio, of counsel) for plaintiffs-appellees, cross-appellants.

John M. Friedman, Jr., New York City (Dewey Ballantine, New York City, Susan C. Meaney, of counsel), for defendants-appellants, cross-appellees.

Before LUMBARD, NEWMAN, and ALTIMARI, Circuit Judges.

LUMBARD, Circuit Judge:

Modern Settings, Inc., and Binder and Binder, as attorneys for Modern Settings, which is bankrupt, brought suit in the Southern District of New York against Prudential–Bache Securities, Inc. (Securities) and Prudential–Bache Metal Co., Inc. (Metal)[1] in 1983 alleging that Securities and Metal wrongfully liquidated Modern Settings's trading account with Securities,

---

1. Modern Settings also named several individuals as defendants in its complaint. The district court dismissed the complaint as to those defendants.

engaged in unauthorized trading in that account in violation of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j (1988), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5 (1990), and negligently misvalued that account.[2] The claims before us arise from Securities's handling of Modern Settings's brokerage account, and Modern Settings's failure to pay for gold consigned to it by Metal.[3]

Modern Settings was a New York corporation engaged in the manufacture and sale of jewelry parts before being adjudged bankrupt on March 25, 1986. Harry Binder was its president and sole shareholder. Securities is a retail brokerage firm and a member of the New York and American Stock Exchanges. Metal, a sister corporation of Securities, is a commodities dealer engaged in the sale of precious metals.

In 1982, Binder invested $2,300,000 in a trading account at a Securities branch office in New York City. Operation of the account was governed by a customer agreement, signed by Binder on behalf of Modern Settings, which had several provisions relevant to this case:

> 5. Whenever in your discretion you (Securities) deem it desirable for your protection ... you may, without prior demand, tender, and without any notice of the time or place of sale, all of which are expressly waived, sell any or all securities ... which may be in your possession, or which you may be carrying for me....
>
> 10. Reports of the execution of orders and statements of my account shall be conclusive if not objected to in writing within five days and ten days, respective-ly, after transmittal to me (Modern Settings) by mail or otherwise.
>
> 13. I understand that no provision of this agreement can be amended or waived except in writing signed by an officer of [Securities], and that this agreement shall continue in force until its termination by me is acknowledged in writing by an officer of [Securities].

(parentheticals supplied).

In February 1983, Modern Settings entered into a consignment agreement whereby Metal advanced gold to Modern Settings for its jewelry business; the equity in the trading account with Securities served as collateral for the advances. Under this agreement, Modern Settings was to maintain at least $900,000 worth of equity in the trading account. If the equity fell below that amount, the agreement gave Metal the right to deem the consigned gold sold to Modern Settings at market price. It also provided that Metal was required to give Modern Settings written notice two business days before liquidation of the trading account.

Modern Settings's account broker at Securities at all relevant times was Gary Adornato. When Modern Settings moved from New York City to Melville, Long Island, it transferred its trading account to Securities's Melville branch in May 1983. Adornato then moved to the Melville branch to continue handling the Modern Settings account.

In June 1983, Binder met with Adornato and his assistant, Lewis Klee, and told them that he needed money for gold and wanted Adornato to sell the account's options for Coleco stock. In July, when Binder asked Adornato whether the Coleco

---

**2.** Modern Settings also alleged that Securities and Metal engaged in a pattern of racketeering in violation of 18 U.S.C. § 1962 (1988) and that they made defamatory statements regarding Modern Settings's creditworthiness. The district court dismissed the RICO claim and did not hold Securities and Metal liable for defamation.

**3.** Prior to trial in 1988, the parties agreed to consolidate two additional actions. The first was Metal's 1984 lawsuit in the New York County Supreme Court against Modern Settings, Bialystock and Bloom Productions Inc. & Co. and others seeking payment for 1,905.74 ounces of gold it had loaned Modern Settings. The second action had been brought by Bialystock, as assignee of Modern Settings's claims, against Securities and Metal in Suffolk County Supreme Court in 1986.

The district court held that Modern Settings assigned its claims against Securities and Metal to Bialystock on June 29, 1984. 1988 U.S.Dist. Lexis 5059. Bialystock paid Modern Settings $325,000 in return for the claims, machinery and intangible assets.

stock options had been sold, Adornato answered negatively, and said that he would sell the options by the end of the week. Instead, Adornato got Modern Settings more deeply involved in the Coleco options market, and began to avoid Binder. In July, Binder complained about Adornato to Frederic Wasserspring, vice-president of Metal, and in mid-August, he also complained to Felix McCarthy, Adornato's supervisor at the Melville Securities branch. Neither complaint was in writing. Despite his complaints about the Coleco trading transactions, on August 25, Binder signed a power of attorney, back-dated to June 15, 1983, in favor of Adornato, with whom he had become friends. Binder testified that the reason he signed the back-dated power of attorney was because "it was not my intent to see anybody go to jail" for unauthorized trading.

In early August 1983, Securities discovered that the Modern Settings's trading account was overvalued by some $300,000, and as a result, the account was undermargined. During the August meeting at which Binder complained of Adornato's Coleco options trading, McCarthy received a telephone call from Securities's margin department informing him of the misvaluation in the trading account. McCarthy told Binder of the error, and later passed this information on to Wasserspring.

On August 18 and 19, Wasserspring spoke with Binder over the telephone to advise him that the Modern Settings account was undercollateralized in terms of the gold consignment agreement. On August 19, Wasserspring sent a hand delivered written notice to Binder informing him that he had two business days (until Tuesday, August 23) to restore the account to the equity level required by the agreement. On Monday, August 22, Adornato telephoned Binder to advise him that Securities

was liquidating the account. Liquidation reduced the account value to $130,000. Securities also froze the assets in the account until February 15, 1985.

Meanwhile, in July 1983, Binder asked Wasserspring if he could increase his consignment, then 1,500 ounces of gold, by 200 ounces. Wasserspring told him that he would have to check the equity in the trading account to determine whether Metal could consign additional gold to Modern Settings. Binder testified that he was told in late July by Joe DeJohn, Wasserspring's assistant, that the equity in the account was only about $900,000 or slightly more,[4] and hence, Metal could not increase the amount of consigned gold. Consequently, Binder knew in July that he could not withdraw money from the account without violating the gold consignment agreement.

Binder decided that Modern Settings should expand into the "finished goods" side of the jewelry business. At the end of July, he attended the Retail Jewelers of America Trade Show, and aggressively solicited orders for the coming Christmas season, and secured $800,000 worth of orders for finished goods alone. Modern Settings requested additional gold from Metal to meet the Christmas orders as it had already processed into finished goods the 1,500 ounces of gold consigned to it. In response to this request for more gold, Metal advanced Modern Settings 100 ounces of gold on August 24, 1983 and 305.74 ounces on September 1. Nevertheless, these amounts were insufficient to meet the orders solicited by Binder. Modern Settings had to decline renewal orders and to revoke orders already accepted. Modern Settings never recovered from these 1983 losses, and business steadily contracted until its bankruptcy in 1986.

After a series of bench trials,[5] Judge Carter held Securities and Metal liable (I)

---

4. This figure was inflated due to the misvaluation in the trading account. Neither Securities nor Metal knew of the misvaluation at the time DeJohn gave Binder the $900,000 figure.

5. In 1988, the district court held Securities and Metal liable for negligent misvaluation of the trading account, unauthorized trading and wrongful liquidation. 709 F.Supp. 70 (S.D.N.Y.

1989). After a second trial in 1988, the court awarded a set-off in favor of Securities and Metal for gold loaned to Modern Settings, but never paid for. 109 B.R. 605 (S.D.N.Y.1989). After a 1990 trial, the court issued its damages opinion, and was advised that it had mistakenly relied on a certain exhibit. As a result, Judge

for unauthorized trading in the account, resulting in damages of $134,849.69, (II) for wrongfully liquidating the account, resulting in damages of $105,000.00, and (III) for negligence in misvaluing Modern Settings's trading account, resulting in damages of $1,133,953.00. He further held that (IV) the total award of liability against Securities and Metal was to be off-set by the value of gold loaned by Metal to Modern Settings which was worth $816,604.72.

Both sides appeal the district court judgment. Securities and Metal contend that the case should be remanded for a determination of whether Binder's conduct contributed to Modern Settings's damages, that the district court's calculation of Modern Settings's post-liquidation value was clearly erroneous, that Securities was justified in liquidating Modern Settings's trading account and that Binder waived his claim to, or ratified, any unauthorized trading. Securities and Metal do not contest the district court's finding that they were negligent in misrepresenting the value of the Modern Settings trading account.

Bialystock, the assignee of Modern Settings's claims, argues that the set-off was improper, that the district court should have granted separate judgments against each defendant, that the district court erred in computing damages for wrongful liquidation and that it erred in awarding costs to both sides.

We affirm in part, reverse in part and remand for further proceedings. We reverse the district court's decision insofar as it held Securities and Metal liable for unauthorized trading and wrongful liquidation of the Modern Settings trading account. We also reverse the award of a set-off in favor of Securities and Metal. Because we reverse the wrongful liquidation holding, we remand for findings as to whether the misvaluation of the account alone caused any of the $1,133,953.00 in damages awarded by the district court for negligent misrepresentation. We also remand the issue of whether Modern Settings's contributory negligence, if any, caused in whole or in part the losses resulting in the diminution of Modern Settings's business. In addition, we remand for findings regarding Modern Settings's post-liquidation value. Finally, we vacate the district court's award of costs and remand for determination of costs in light of further proceedings.

## I. Securities's Liquidation of the Trading Account

The district court held Securities and Metal liable for wrongful liquidation of Modern Settings's trading account. We reverse.

The customer agreement gave Securities discretion to liquidate the account whenever Securities deemed it desirable for its own protection, "without prior demand, tender, and without any notice of the time or place of sale, all of which are expressly waived...." Liquidation provisions in securities broker-customer contracts have been upheld by courts where sufficient equality of bargaining power exists, as between a sophisticated, experienced investor and a broker, and where the liquidation provisions are commercially reasonable. *See Geldermann & Co., Inc. v. Lane Processing, Inc.*, 527 F.2d 571, 575–76 (8th Cir.1975). However, this contractual power must be exercised in good faith. *See Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 992 (S.D.N.Y.1984).

The district court concluded that Securities and Metal had the right to liquidate the margin account without notice, as long as they acted in good faith. 709 F.Supp. at 74–75. However, the court also held that "the right to liquidate without notice was waived by Wasserspringer's [sic] letter of August 19, and by [Securities's] margin call of the same date." *Id.* at 75. We believe that neither the Wasserspring letter nor the internal margin call resulted in a waiver of the customer agreement's provision allowing Securities to liquidate the account without notice to Modern Settings.

Securities, and not Metal, liquidated the margin account. Wasserspring's letter, hand delivered to Binder on August 19 after the error in the account was discover-

Carter filed a revised opinion on damages. 747 F.Supp. 194 (S.D.N.Y.1990).

ed, gave Modern Settings until August 23 to meet the collateral terms of the gold consignment agreement. As executive vice-president of Metal, Wasserspring acted pursuant to the gold consignment agreement to which Modern Settings and Metal were parties. That agreement stated that upon default of the collateral provisions, Metal could give two business days notice to Modern Settings to comply with the minimum collateral requirement. Upon failure to post the requisite security, Metal was entitled to liquidate the margin account, which Modern Settings had pledged as collateral for the consigned gold. The gold consignment agreement was entirely separate from the customer agreement executed by Modern Settings and Securities. Metal had no authority to waive the "no notice" clause in the agreement between Securities and Modern Settings. Thus, Wasserspring's letter had no effect on Securities's ability to liquidate the account prior to August 23.

■ Furthermore, the district court placed undue emphasis on Securities's August 19 margin call, which Binder never received. Securities's policy was to give the customer ten days from the date of the call to comply with the account's margin requirements, which in this case would have been August 29. Margin calls usually were sent from the margin department of Securities to the appropriate branch, which then informed the customer. However, McCarthy, the Melville branch manager, never saw the margin call, and hence neither did Binder. Although it may have been the customary practice of Securities to grant customers with undermargined accounts a ten-day grace period to meet margin requirements, the mere fact that Securities did not always exercise its contractual right to liquidate margin accounts without notice did not amount to a waiver of that right. Nor did Modern Settings rely to its detriment upon this practice. It offered no proof that it was ready to meet the margin deficit of $210,056. Indeed, Binder acknowledged that he "didn't have the money."

We conclude that there was no waiver of Securities's explicit contractual right to liquidate the Modern Settings account.

## II. *Adornato's Trading in Coleco Options*

The district court held Securities and Metal liable for the unauthorized trading of Adornato. We reverse because Binder did not object to the trades in writing within ten days of receiving his account statement as he was bound to do under the customer agreement.

■ The customer agreement between Modern Settings and Securities provided that, "Reports of the execution of ... statements of [Modern Settings's] account shall be conclusive if not objected to in writing within ... ten days ... after transmittal to [Modern Settings] by mail or otherwise." Modern Settings received monthly account statements detailing the trading in Coleco stock options in both June and July of 1983. Although, the district court credited Binder's testimony that this trading was in direct contravention to his orders to Adornato, Modern Settings never made a written complaint to Securities as required by the customer agreement. With regard to the failure to object, the district court found that "[a]lthough there is no evidence that Binder filed a written complaint with [Securities] or [Metal] about his broker, he did complain to McCarthy and Wasserspringer [sic] about Adornato. That was sufficient." 709 F.Supp. at 76. However, the only objection by Modern Settings contemporaneous to the unauthorized trading of Coleco stock options in mid-July was Binder's oral complaint to Wasserspring, an employee of Metal. Binder did not complain to Adornato's supervisors at Securities until August 17, 1983, when he made an oral complaint to the Melville branch supervisor, McCarthy. Neither of these complaints were in writing as required by the customer agreement.

■ The purpose of the ten-day written complaint clause in the customer agreement is to require the customer to memorialize his or her complaint soon after receipt of the account statement rather than wait-

ing to see if the trade is profitable. The writing requirement of the clause insures that unauthorized trading disputes are not relegated to "swearing contests" between broker and customer. For these reasons, broker-customer agreements requiring written notice of objection within a limited amount of time after the customer receives confirmation of the transaction generally have been enforced by courts. *See Brophy v. Redivo*, 725 F.2d 1218, 1219–20 (9th Cir. 1984) ("immediate" written notice of objection provision in customer's agreement is enforceable to bar claim of unauthorized trading); *In re Olympia Brewing Co. Securities Litigation*, [1985–86 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,461, at 92,813, 92,819, 1985 WL 3928 (N.D.Ill. Nov. 13, 1985) (ten day written notice of objection provision enforceable to bar claim); *see also Knickerbocker v. Gould*, 115 N.Y. 533, 537, 22 N.E. 573 (1889) (failure to object to account statement when statement requested the customer to verify its terms resulted in ratification); *Robinson v. Miller*, 210 A.D. 450, 454, 206 N.Y.S. 248 (1924) (customer's failure to object to monthly account statement resulted in ratification). There will be instances where a disparity in sophistication between a brokerage firm and its customer will warrant a flexible application of such written notice clauses. *See, e.g., Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1200 (8th Cir.1982) ("When a customer lacks the skill or experience to interpret confirmation slips, monthly statements or other such documents, courts have generally refused to find that they relieve a broker of liability for its misconduct."). Similarly, we do not foreclose the possibility that a broker may be estopped from raising a defense based on the written notice clause if the broker's own assurances or deceptive acts forestall the customer's filing of the required written complaint. *Cf. Cange v. Stotler & Co.*, 913 F.2d 1204, 1209–10 (7th Cir.1990). Nevertheless, the circumstances of the present case do not implicate these

concerns. We therefore reverse the holding of the district court that Securities and Metal were liable for unauthorized trading.[6]

### III. *Damages Caused by the Negligent Misvaluation of the Trading Account*

Securities does not challenge the district court's conclusion that it was negligent in misrepresenting the value of the Modern Settings trading account. Because we reverse the district court's holding that the liquidation of the trading account was wrongful, *see supra* part I, we remand to the district court for a determination of whether the misvaluation of the account alone caused any of the $1,133,953.00 in damages awarded by the district court.

### A. Apportionment of Damages

█ In holding Securities liable for negligent misrepresentation to Modern Settings for misvaluing the trading account, Judge Carter wrote that Securities was:

on notice through Adornato that Binder relied on the information received to determine the amount of money he could take from the account for business and other purposes. Its negligent misrepresentation caused him to take more funds from the account than he would have had he been aware of the true status of his account.... [Securities] knew or should have known that Binder used the information received to determine the extent of expenditures he could make in his business and that he would rely on the information given.

709 F.Supp. at 74 (citations omitted). On appeal, Securities contests the district court's failure to apportion damages as required by N.Y.Civ.Prac.L. & R. § 1411 (McKinney 1976), which provides that a negligent plaintiff's recovery "shall be diminished in the proportion which the culpable conduct attributable to the claimant ... bears to the culpable conduct which caused the damages." We agree, and remand for

---

**6.** Because we hold that Modern Settings waived its claim against Securities and Metal by failing to object in writing ten days after disputed trades as it was bound to do under the customer agreement, there is no need to consider the district court ruling that Binder did not intend to ratify the Coleco trades by signing the backdated power of attorney.

findings regarding Binder's relative negligence in his conduct of Modern Settings's affairs.

Binder admitted that, in late July 1983, he knew the equity in the account was slightly over $900,000. Hence, he should have known that he could not withdraw sufficient funds to finance Modern Settings's expansion into the "finished goods" side of the jewelry business. Nevertheless, Binder aggressively solicited orders for the 1983 Christmas season, which Modern Settings could not fill because it did not have the funds to purchase the necessary gold. In addition, Modern Settings apparently did not avail itself of a $500,000 line of credit available to it from Bank Leumi, through which it presumably could have financed additional gold purchases to meet the new customer orders. Although the district court found that Binder was not contributorily negligent in failing to discern the error in the account's valuation, it never made any findings as to whether Binder's own negligent conduct contributed to Modern Settings's business decline. Thus, we remand to the district court for findings on whether any of the $1,133,953.00 in damages that it awarded for misvaluation of the trading account should be reduced due to contributory negligence on the part of Modern Settings in conducting its business affairs.

### B. The District Court's Reduction of Modern Settings's Post–Liquidation Value in its Revised Damages Opinion

▇ The remedy for misvaluation of the trading account is the difference in the value of Modern Settings prior to the injury caused by the misvaluation[7] (*i.e.*, the trading account liquidation, and the consequent contraction of Modern Settings's business) less its value after the injury. In its original damages opinion, the district court held that Modern Settings had a post-liquidation value of only $350,000 because

"the company limped along" after liquidation of its trading account. The court later issued a revised damages opinion because it had erroneously relied upon the wrong expert exhibit in calculating the pre-liquidation value of Modern Settings. In the revised opinion the court stated, "Now that we are using figures that deflate plaintiff's pre-liquidation value, it seems only appropriate that its post-liquidation value should also be scaled back." 747 F.Supp. at 197 n. 1. The court held, without any explanation, that Modern Settings's post-liquidation value was $200,000. Thus, we remand for findings regarding Modern Settings's post-liquidation value.

### IV. The Award of Set–Off to Securities and Metal for Consigned Gold

▇ The district court held a separate trial on the issue of a set-off for the 1,905.-74 ounces of gold consigned to Modern Settings, for which Modern Settings never paid. The court held that Securities and Metal were entitled to set off against their joint and several liability of $1,373,802.69 the value of the gold loaned to Modern Settings and consignment fees which were worth $816,604.72.

Since the only basis for liability that will remain open on remand is the misvaluation of the trading account, conduct for which only Securities is liable, Metal has no liability to Modern Settings and hence faces no claim by Modern Settings's assignee, Bialystock. For this reason alone there can be no set-off of the claim by Metal against Modern Settings for a portion of the unpaid gold (405 ounces), a claim that Metal did not assign to Securities. Metal will have to pursue its claim in the bankruptcy proceeding. What remains for consideration is whether Securities, in defending against Modern Settings's assigned claim to Bialystock for misvaluing the account, may set off the claim against Modern Settings for the major portion of the unpaid gold (1,500

---

**7.** The district court arrived at its pre-liquidation value by estimating the net income of Modern Settings for each year from 1984–1989, had its business not been injured by the misvaluation. It adjusted these figures to account for depreciation, working capital additions, capital expenditures, proceeds from new debt and payback of principal. The court then discounted the figure from each year to present value.

ounces), a claim that Securities obtained by assignment from Metal in 1983.

The equitable remedy of set-off is unavailable where the claims do not involve mutual debts and credits. *See In re Consolidated Indemnity & Insurance Co.*, 287 N.Y. 34, 38, 38 N.E.2d 119 (1941); *Beecher v. Vogt Manufacturing Co.*, 227 N.Y. 468, 473, 125 N.E. 831 (1920); *Morris v. Windsor Trust Co.*, 213 N.Y. 27, 30, 106 N.E. 753 (1914). Mutual debts are "due to and from the same person in the same capacity." *Beecher*, 227 N.Y. at 473, 125 N.E. 831; *see also Morris*, 213 N.Y. at 32, 106 N.E. 753. As Judge Carter concluded, there is a lack of mutuality in this case because the obligation of Securities to Modern Settings arose from breach of a fiduciary obligation. Judge Carter found that Securities had a fiduciary obligation to provide accurate and reliable information on the financial status of the account. 709 F.Supp. at 74. Though Securities was not acting as a technical trustee, *cf. Fore Improvement Corp. v. Selig*, 278 F.2d 143 (2d Cir.1960); *id.* at 147, 148 (Friendly, J., concurring), its breach of a fiduciary obligation was nonetheless sufficient to defeat the mutuality required for a set-off. *See Allegaert v. Perot*, 466 F.Supp. 516, 518 (S.D.N.Y.1978). We also have considerable doubt whether, in the circumstances of this case, New York would allow a set-off of a claim acquired by assignment from a closely related corporation where the result would be to permit the assignor (Metal) to receive full payment on its claim, rather than pursue the claim in bankruptcy along with Modern Settings's other creditors.

Securities and Metal argue that the set-off is required in the interests of justice. Although there may be an exception to the strict mutuality rule where an injustice would be caused by disallowing a set-off, *see Beecher*, 227 N.Y. 468, 125 N.E. 831, we see no evidence of injustice in denying the set-off to Securities and Metal. Apparently, the district court was swayed by the fact that the Bialystock shareholders and officers had similar stakes in Modern Settings. However, Bialystock paid fair value for the claims seven years ago when recovery on those claims seemed a very speculative prospect. Further, it was Modern Settings's business which benefitted from the gold consignments, not Bialystock's.

Because of a lack of mutuality between Modern Settings's assigned claim to Bialystock and the claim of Securities against Modern Settings, we reverse the district court's ruling that Securities is entitled to a set-off against its liability.

Affirmed in part, reversed in part and remanded for further proceedings.