**In re JOHN DAWSON & ASSOCIATES, INC., Debtor.**

**Adversary No. 99 A 00536.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Jan. 16, 2003.

---

**7.** Local Rule 40.5, cited by the Trustee, shall not apply to the court's remand of this action.

Lloyd Kadish, Lloyd Kadish & Associates, Ltd., Chicago, IL, for Claimant.

Karen Caplan, Washington, DC, for Securities Investor Protection Corporation.

John R. Landis, Foley & Lardner, Chicago, IL, for Trustee.

## MEMORANDUM OPINION

JOHN D. SCHWARTZ, Bankruptcy Judge.

This opinion follows a four day trial in which Douglas Cameron sought to prove that he is entitled to funds for losses due to allegedly unauthorized trades under the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa et seq. ("SIPA"). J. William Holland, in his capacity as trustee ("Trustee") for John Dawson & Associates, Inc. ("JDA") takes the position that Cameron's claim must fail because Cameron did not make written objections and because Cameron does not qualify as a "customer" entitled to a SIPA advance.

From 1972 until October 1998, when it ceased operations, JDA conducted business as a licensed broker/dealer, engaged in the purchase, sale and trade of securities on behalf of its clients and itself, with its principal place of business in Chicago, Illinois. At such times, JDA was a broker member of the Securities Investor Protection Corporation ("SIPC").

Created under SIPA, SIPC is a federally chartered non-profit corporation which maintains a fund for the protection of investors against losses arising from the insolvency of brokers who are SIPC members. On April 13, 1999, upon application by SIPC, the United States District Court for the Northern District of Illinois, entered an order for the liquidation of JDA under SIPA; implemented the automatic stay provisions of section 362 of the United States Bankruptcy Code; and referred the

matter to this court as though it were a case conducted under provisions of chapter 7 of the Bankruptcy Code.

## The Facts

### The Claim

On or about June 15, 1999, the Trustee received a claim form from Cameron. Cameron's claim form alleges losses of $1,012, 084.95. (6/10, 67, TEX 2).[1]

On or about June 16, 1999, at the request of the Trustee's office, Cameron provided the Trustee with an affidavit dated February 22, 1999 in support of his claim. (6/10, 67–68; TEX 3). The affidavit states the losses set forth in Cameron's claim resulted from five index options trades on and after September 22, 1998.

On July 5, 2000, SIPC denied Cameron's claim on the grounds that he failed to make "a timely written complaint to any representative of JDA" and "ratified a course of conduct" resulting in "a de facto grant of [trading] authorization to [JDA]." (TEX 5).

### The Account

Cameron opened his account with JDA in the late 1970's after having been introduced to John D. Glasgow, III ("Glasgow"), a registered representative employed by JDA. (6/10, 17–18). The account was a margin account. (6/12, 48–49). Glasgow and his assistant, Ken Ko ("Ko") were the only individuals authorized to make transactions in the account. (6/12, 23–24). The account was "non-discretionary" which means that every transaction required Cameron's prior approval. (6/10, 17; 6/12, 24). Cameron described his account as "conservative". He intended to purchase and hold in the account common and preferred stocks. (6/12, 24–25). Cameron had a transaction "comfort level" of $50,000–$100,000. (6/12, 25).

In early 1995, Cameron executed a customer agreement with Bear Stearns, the then-new clearing firm for JDA. (6/12, 35–37; TEX 10–11).

The customer agreement states as follows:

> Reports of the execution of orders and statements of your account(s) shall be conclusive if not objected to in writing within five days in the case of reports of execution, and ten days in the case of account statements, after such documents have been transmitted to you by mail or otherwise.

(6/12, 37–38; TEX 10–11).

Cameron received written trade confirmations from Bear Stearns for all or virtually all of the transactions in his account at his home approximately 7–10 days following the entry of a transaction. The confirmations contained the following language on the back side: "Monthly account statements shall be considered accepted and approved by you absent written notice of objection within ten days after receipt." (TEX 12).

### The Claimant

Cameron is a sophisticated investor. He has a bachelor's degree and a master's degree in business administration. He was employed by Northern Trust form 1974–76 and was associated with JMB Realty from 1976 to 1995. His last position at JMB Realty was vice-president of property sales. In 1998, he founded HI Group, an international real estate brokerage. He is the president and majority shareholder. HI Group does between $550 million and $1 billion in transactions each

---

1. References to the trial transcript include the date and the page number or numbers. References to the trial exhibits are to the Trustee's exhibits ("TEX"), to the claimant's exhibits ("CEX") or to joint exhibits ("JEX").

year. Cameron supervises 17 employees. (6/10, 14–15; 6/12, 7–9).

Cameron has had more than 25 years of investment experience. (6/12, 16). He demonstrated, at trial, familiarity with and knowledge of options, covered call writing, put/call spreads, put/call buys, put writing and uncovered call writing. (6/11, 135–140; 6/12,103).

In 1998, Cameron had accounts with other brokerage firms. He had $1.1 million with Fidelity Investments, $200,000 with Schwab, $1.2 million with Everen, and $500,000 with Pine Grove Associates. (6/12, 17–23; TEX 16–22). At no time has Cameron maintained any discretionary brokerage account. (6/12, 14–15).

### The Trades

*Round One: October 1997–February 1998*

Cameron seeks reimbursement for losses suffered as a result of five allegedly unauthorized index options transactions beginning on or about September 22, 1998. (6/10, 19–20, 37–38; TEX 2, 3; CEX 5).

For eleven months prior to those transactions, however, JDA engaged in trading in Cameron's account that he testified at trial was unauthorized. The instances of trading and oral objections that occurred during this time established a pattern of ratification that estops Cameron from receiving SIPA funds for the five trades contained in his claim.

On or about October 31, 1997, a purchase was made in Cameron's account of 120,000 shares of Xylan Corp. for a purchase price of $2,115,009. (6/12, 54–55; JEX 1). This purchase exceeded the net equity in his account. (6/12, 55, 57).

Cameron testified that he learned of the Xylan purchase when he reviewed his October monthly account statement in mid-November 1997. (6/12, 57). He testified that he called Glasgow and asked him what the stock was doing in his account. According to Cameron, Glasgow explained that he was "trying to do some sort of year end tax thing" that would involve "several trades that would go past the year's end" and that Cameron should "bear with him." (6/12, 58–61). Cameron accepted the explanation and the transaction. (6/12, 61).

Additional large purchases and sales of Xylan stock continued in Cameron's account in November 1997. A November 17, 1998 sale of Xylan stock resulted in a profit for Cameron's account of $11,161. (6/12, 63–64; TEX 34; CEX 18). Cameron says that he learned of the November Xylan transactions when he reviewed his monthly account statement in midDecember 1997. (6/12, 64). Cameron again contacted Glasgow and said that he didn't like the trading. (6/12, 65). He again accepted the explanation and the trades, and "never considered closing" the account. (6/12, 64–65, 70).

More multi-million dollar trades in Xylan were made in December 1997. 100,000 shares of Xylan stock purchased in November was sold in December, generating a profit of $18,669. (6/12, 82; CEX 18; JEX 1). By the end of December 1997, the net equity in Cameron's account had fallen by approximately $1 million. (6/12, 77–79; JEX 1).

Cameron testified that he learned of the December 1997 trades when he reviewed his monthly statement in mid-January 1998. (6/12, 80). Cameron contacted Glasgow and asked "when are you cleaning this up?" (6/12, 79). He instructed Galasgow to "get the stuff out of my account and make sure I'm made whole." (6/12, 81).

Contrary to Cameron's instructions, the Xylan stock remained in his account through January 1998. (6/12, 84; JEX 1). Even though his directions had been disobeyed, Cameron allowed the account to proceed. (6/12, 87).

In February 1998, a one-day purchase and sale was made of Realax stock and the remaining shares of Xylan were sold. Cameron realized a profit from the sales to his account of $52,226. (6/12, 96; CEX 18). Cameron's response to the transactions upon reviewing his February account statement was "relief". (6/12, 97). Cameron instructed Glasgow not to "do it again". (6/12, 98).

*Round Two: June 1998–September 1998*

On May 11, 1998, Cameron completed and executed a Bear Stearns options approval form. (6/11, 135; TEX 23). Because Glasgow did not do options trading, Ken Ko, Glasgow's assistant, was assigned to broker Cameron's trades. (6/11, 138; 6/12, 110–11). The account was to continue to be non-discretionary and Cameron indicated that transactions in amounts of 10–20 units were appropriate. (6/11,140; 6/12, 110).

According to Cameron, only three trades in his June 1998 monthly account statement were authorized. (6/12, 121–22; JEX 1). He identified seven trades as allegedly unauthorized. (6/12, 120; TEX 7; CEX 18). Cameron testified that he learned of the June trades in mid-July 1998 when he received and reviewed his June 1998 monthly account statement. (6/12, 128). Cameron testified that he called Glasgow and said, "you know, I put up with this once. I don't want these trades. I don't know what you're doing in my account." According to Cameron, Glasgow disavowed any knowledge of the trades and directed him to Ko. (6/12, 146).

Cameron then contacted Ko and said, "I got all these unauthorized trades in my account. I don't know what you're doing with my account, and I want you to clean it up. I don't want any more trades in the account." (6/12, 146). Ko responded, "We'll make some corrections. We'll make the corrections." (6/12, 147).

Four options transactions in Cameron's account in July 1998 were identified by him at trial as unauthorized. (6/13, 20–21, 23–26; TEX 7; CEX 18). The trades generated a profit of approximately $135,000. (6/13, 21; CEX 18).

Cameron learned of the activity in his account by reviewing his monthly account statement in mi-August 1998. (6/13, 15, 27). Cameron testified that he was "disappointed that [Ko] had lied" to him about "cleaning up" the account. (6/13, 28). He called Ko and said "you're not getting the job done. You promised me you were going to clean this up, and I would like to talk to your boss to get it done." (6/13, 29). Ko said that he would have Peter Cho ("Cho"), an officer and director of JDA, call Cameron, which Cho did. (6/13, 29–30).

Trading continued into August 1998 that Cameron alleges was unauthorized. He identified 14 closed transactions and 5 open positions as unauthorized. (6/12, 43–46; TEX 7, CEX 18). Each transaction exceeded the investment parameters established by Cameron. (TEX 7; CEX 18).

Shortly after Labor Day in September 1998, Cameron spoke to Cho regarding the unauthorized transactions in his account. (6/13, 35). During this conversation, Cho blamed the prior trades on Ko and used the term "arbitrage" to explain the trades as "riskless trading." (6/13, 50). Cameron considered this explanation inadequate. (6/13, 37–38). Cameron instructed Cho to "remedy this and clean up the unauthorized trades and get the positions out of my account." Cho assured Cameron that the trading would stop and that "he would clean up the account." (6/13, 38).

Trading that Cameron alleges was unauthorized continued through September 1998. Excluding the five trades contained in his claim, Cameron identified 15 closed transactions in September as unautho-

rized. (6/13,51–58; TEX 7; CEX 18). Each of the transactions exceeded Cameron's investment parameters. (TEX 7, CEX 18).

On September 22, 1998, Cameron transferred $650,000 from his Everen account to his account with JDA. (6/13, 63–64).

*The Five Trades in Cameron's Claim*

Cameron seeks protection for five index options trades beginning on September 22, 1998 that are allegedly "unauthorized" and generated losses of $1,012,084.95. (6/10, 19–20, 37–38; TEX 2,3: CEX 5).

On or about September 28, 1998, Cameron's account purchased and sold puts for a profit of $14,906. (6/13, 66–67; TEX 7);

Cameron testified that on October 1, 1998, he saw "two massive unauthorized trades" in his September monthly account statement. (6/10, 19). Cameron unsuccessfully attempted to contact Glasgow and Ko the next day. (6/10, 21). Cameron testified that he spoke to Glasgow on October 3, 1998 and asked, "what do you guys think you're doing?" Glasgow could offer no meaningful explanation other than "Cho has gone crazy." Cameron then spoke to Cho on October 4 and Cho supposedly admitted that the trades were unauthorized and promised to "clean it up." (6/10, 26).

On October 5, the transactions identified in Caleron's claim were removed from his account. (6/10, 28; CEX 14; JEX 1). On October 6, 1998, Bear Stearns transferred the five positions back to Cameron's account. (6/10, 36; JEX 1). On October 7, 1998, Cameron had a conversation with Glasgow in which Glasgow purportedly indicated that "unauthorized trades" had been made in other customer accounts. (6/10, 30–31). Cameron also purportedly spoke to Ko who stated the trades in Cameron's account were "unauthorized." (6/10, 30–31).

Finally, Cameron had a conversation with his attorney and representatives of Bear Stearns concerning the transactions. (6/10, 35–36). Cameron, however, did not submit a written document to JDA or Bear Stearns concerning the five trades (or any of the other allegedly unauthorized transactions over the previous year) until his attorney sent a letter dated November 4, 1998. (6/10, 37; CEX 17).

### Discussion

 SIPA is a federal statutory scheme designed to afford limited financial protection to individuals or entities holding accounts of failed broker/dealers. *See, generally, SIPC v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). A fund established by SIPA and administered by SIPC protects investors against losses resulting from the insolvency of broker/dealers that are SIPC members. *SIPC v. Oberweis Securities, Inc.,* 1992 WL 119272, at *8 (Bankr.N.D.Ill. May 21, 1992).

 SIPA provides "relief to certain classes of customers." *SEC v. Packer, Wilbur & Co.,* 498 F.2d 978, 983 (2d Cir. 1974). SIPC "provides limited cash advances to qualifying 'customers' who have suffered ... losses." *In re John Dawson & Associates, Inc.,* 271 B.R. 561, 565 (Bankr.N.D.Ill.2001).

SIPA § 78*lll* (2) defines a "customer" as follows:

[A]ny person ... who has a claim on account of securities received, acquired, or held by the Debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting a transfer. The term "customer" includes any person who has a claim

against the Debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the Debtor for the purpose of purchasing securities.

Courts have taken a restrictive view of the scope of customer protection pursuant to SIPA. *See e.g., SIPC v. Pepperdine Univ. (In re Brentwood Secs., Inc.),* 925 F.2d 325 327 (9th Cir.1991); *SIPC v. Stratton Oakmont, Inc.,* 229 B.R. 273, 278 (Bankr.S.D.N.Y.1999), *aff'd,* 210 F.3d 420 (2nd Cir.2000); *In re A.R. Baron & Co.,* 226 B.R. 790, 795 (Bankr.S.D.N.Y. 1998). The term "customer" is given a narrow meaning. *In re Stalvey & Assocs., Inc.,* 750 F.2d 464, 472 (5th Cir.1985).

A "customer" is entitled to be paid by SIPC in an amount equivalent to his net equity, up to the $500,000 SIPA limit. Net equity is "computed by taking the dollar amount of funds in the account [as of the day when SIPA proceedings are brought], excluding specifically identifiable property that will be returned to the customer, deducting any indebtedness and other obligations owed by the customer to the broker, and by giving effect to certain open contractual commitments. 15 U.S.C. §§ 78fff–3(a), 78lll (11)." *In the Matter of Oberweis Securities Inc.,* 135 B.R. 842 (Bankr.N.D.Ill.1991).

"[C]laims based on fraud or breach of contract are not . . . part of a customer's net equity claim." For example, "[t]he failure to execute an order to buy securities gives rise to a breach of contract claim for damages, but is not a customer claim protected by the SIPA . . . [because the] damage would have occurred even if the debtor had not become insolvent. . . . [The] loss is not a direct result of the debtor's insolvency." Such claim "must be satisfied from the general estate, not SIPC funds." *Id.* at 846–847.

Nevertheless, claims of unauthorized trading "may constitute a customer claim under SIPA" because "customer property" includes "the proceeds of any such property transferred by the debtor, including property unlawfully converted." *In re Adler Coleman Clearing Corp.,* 198 B.R. 70, 74 (Bankr.S.D.N.Y.1996). *See also In re Stratton Oakmont, Inc.,* 257 B.R. 644, 651 (Bankr.S.D.N.Y.2001). Misappropriation includes the use of investors' funds to effect unauthorized purchases of securities. *S.E.C. v. S.J. Salmon & Co., Inc.,* 375 F.Supp. 867, 871 (S.D.N.Y.1974).

Under Illinois law, conversion is defined as "any unauthorized act, which deprives [a person] of his property permanently or for an indefinite time." *In re Rosin,* 156 Ill.2d 202, 206, 189 Ill.Dec. 400, 620 N.E.2d 368 (1993)(*quoting In re Thebus,* 108 Ill.2d 255, 259, 91 Ill.Dec. 623, 483 N.E.2d 1258 (1985)).

To establish a customer claim in a SIPA proceeding based on unauthorized trading, a claimant must carry his burden of proof by presenting evidence that the trading was unauthorized through "(i) a written complaint made within a reasonable period of time after receipt of a written confirmation or other written notification of a securities transaction or (ii) some other reasonably contemporaneous documentation supporting such allegation." *In re Euro–Atlantic Secs., Inc.,* No. 98/9304A, Mem. Order at 3 (Bankr.S.D.N.Y. May 4, 2000).

In an often cited case on written complaints, the Second Circuit explained that:

The purpose of the ten-day written complaint clause in the customer agreement *is to require the customer to memorialize his or her complaint soon after receipt of the account statement rather than waiting to see if the trade is profit-*

*able.* The writing requirement of the clause insures that unauthorized trading disputes are not relegated to "swearing contests" between broker and customer. For these reasons, broker-customer agreements requiring written notice of objection within a limited amount of time after the customer receives confirmation of the transaction generally have been enforced by the courts.
*Modern Settings, Inc. v. Prudential–Bache Securities, Inc.,* 936 F.2d 640, 645–646 (2nd Cir.1991)(emphasis supplied).

However, the court went on to opine that the written notice clause should be flexibly applied where there is a disparity in sophistication between a brokerage firm and its customer. *Id.* at 646. In addition, the Court did not "foreclose the possibility that a broker may be estopped from raising a defense based on the written notice clause if the broker's own assurances or deceptive acts forestall the customer's filing of the required written complaint." *Id.*

 A defendant may overcome a claim of unauthorized trading by showing "that the broker in fact had the authority or discretion to execute the transactions in question." Hazen, 3 Law Sec.Reg. § 14.21. If the Trustee demonstrated that the transactions in Cameron's account were authorized, Cameron's claim is "unenforceable against the debtor and property of the debtor." *In re Adler Coleman Clearing Corp.,* 198 B.R. at 74.

 Under Illinois law, "[a] series of ratifications, express or implied, of similar transactions will give implied actual authority to an agent to make such transactions in the future, even though they are beyond his express authority." *Evanston Bank v. ContiCommodity Servs., Inc.,* 623 F.Supp. 1014, 1034 (N.D.Ill.1985). In the context of unauthorized trading, prior ratifications of similar transactions and acquiescence or participation in a course of conduct will demonstrate that transactions are not unauthorized. *See e.g. Lincoln Commodity Services v. Meade,* 558 F.2d 469, 471–72 (8th Cir.1977), *Ellwood v. Mid States Commodities, Inc.,* 404 N.W.2d 174 (Iowa 1987) and *Shapiro v. Bache & Co., Inc.,* 116 Ariz. 325, 569 P.2d 267 (App. 1977).

In *Shapiro v. Bache & Co., Inc.,* Samuel Shapiro maintained a non-discretionary account at Bache. When transactions were made without his prior approval, he contacted his broker by telephone to protest. His broker said he would "take care of it" but never did. He alleged in his complaint against Bache that unauthorized transactions were made over two years and he accused the firm of churning his account. Throughout the two years in question, however, he continued to do business with the firm, retained the transactions alleged to be unauthorized and never filed a written complaint or objection, as required by his customer agreement. Shapiro argued that he did not know that he was required to make a written complaint.

The Court found that argument to be "unavailing. There is nothing in the record to suggest that [Shapiro] did not have the knowledge, capacity or opportunity to read the agreement and to understand it." *Id.,* 569 P.2d at 270. Further, the Court held that "under the undisputed facts, and as a matter of law, Shapiro ratified the unauthorized transactions. He readily admitted that his protests always resulted in explanations and reassurances from his brokers in which he acquiesced, and that he continued to deal with them." *Id.* at 271.

Similarly, in *Ellwood v. Mid States Commodities,* Richard Ellwood opened a nondiscretionary account with Mid States,

a registered commodities broker. Fourteen unauthorized trades on Ellwood's account occurred between the date the account was opened and the date of the first authorized trade. After receiving each of the written confirmations of the trades, Ellwood called his broker and accepted his assurances that the "error" would be corrected. In the six months that followed, the broker made 130 unauthorized trades. During that same period, Ellwood added $21,000 to his account.

The Court found that Ellwood "did not take steps a reasonable person apprised of the scheme of unauthorized trading would have taken such as notifying someone with more authority than [his broker]. He also failed to follow the dictates of the notification requirement of the customer's agreement. The findings made by the [trial] court clearly indicate the elements of a ratification . . ." *Id.* at 182.

### Conclusion

■■■■ Here, Cameron is a sophisticated and experienced investor. He had multiple brokerage accounts, each with large sums and all of which he chose to control. After listening to the testimony and reviewing the exhibits, it is a mystery to this Court why, after the first time that Glasgow failed to follow Cameron's directive to stop the unauthorized trading in the account, Cameron failed to move the account elsewhere. By failing to remove his account, he allowed Glasgow and then Ko to conduct numerous transactions in his account, many of which turned out to be profitable and many of which went well beyond the parameters of his "comfort level" of $50,00–$100,000. This trading continued without his prior approval, for months on end. Even though he would complain he never took affirmative action by closing the account. By allowing the first eleven months of trades without written objection or closing the account, Cam-

eron is not in a position to now say that the five trades are entitled to SIPA coverage, even though those transactions were beyond his agent's express authority.

Cameron offered two explanations for his behavior. He said that he was preoccupied with family and business matters during the relevant time periods (6/10, 15–17; 6/12, 86) and he said that he was unaware of the writing requirement of his brokerage agreements. (6/12, 37). Neither of these explanations is sufficient or believable. He had time to make his own trades, some of which were in like investments though within his parameters.

While the Court has compassion for Cameron's family problems, it does not explain why after so many unauthorized trades he transferred $650,000 from his Everen account to his JDA account. He could have just as easily transferred his holdings in the JDA account to Everen, where no unauthorized trading was being conducted. In fact, in the time it took him to have any one of the telephone conversations complaining about unauthorized trades he had with JDA representatives, he could have called one of his other brokers and directed the JDA holdings to be transferred.

With respect to the requirement of a written objection, an experienced, sophisticated businessman like Cameron cannot be excused from reading his contracts. *Modern Settings, Inc.*, 936 F.2d 640; *Shapiro v. Bache & Co., Inc.*, 116 Ariz. 325, 569 P.2d 267.

Although Cameron frequently owed Bear Stearns on his margin account because of the trading that he now calls unauthorized, he often netted profits from the transactions. Those profits, along with the $650,000 deposit to the account in September 1998 suggest to this court that Cameron was fully aware of what his brokers were doing all along and chose not to

act. Now he seeks to be reimbursed from SIPA on the trades that went south. He has not offered to relinquish his profits on the "unauthorized" trades that were profitable. He wants his cake and to eat it, too.

The law is clear. SIPC will return securities and reimburse a "customer" for funds being held by a debtor as of the date it files for relief under SIPA. SIPC will also pay a "customer" on a claim of unauthorized trading, if the customer can demonstrate that the trading was indeed unauthorized. Cameron has not convinced this court that the trades in question were unauthorized. He ratified the actions of his brokers by his own failure to act. The telephone calls he described in his testimony were insufficient. Without a written objection or the removal of his holdings from JDA in a timely manner, Cameron has failed to show that the five trades in his claim were ones that should be covered by SIPA. Therefore, he has no grounds to obtain reimbursement from SIPA.

For the foregoing reasons, the Trustee's denial of Cameron's claim is upheld. This Memorandum Opinion constitutes the court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.