**In re JOHN DAWSON & ASSOCIATES, INC.,
Debtor.**

**Claim of Joan L. Erickson Trust.**

No. 99 A 00536.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Aug. 10, 2001.

James Eccleston, Eccleston & Associates, Chicago, IL, for Plaintiff.

John Landis, Foley & Lardner, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

JOHN D. SCHWARTZ, Judge.

This matter comes before the court on the motion of Richard Erickson ("Erickson"), as trustee for the Joan Erickson Trust ("Trust"), for summary judgment with respect to the Trust's claim for a customer advance in the amount of $371,415.04 under the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa et seq. ("SIPA").[1] Denying the claim and opposing this motion, J. William Holland ("Trustee"), in his capacity as trustee for John Dawson & Associates, Inc., ("Debtor") asserts that the Trust's claim for conversion must fail because the Trust did not make a timely written objection and because the Trust does not qualify as a "customer" entitled to a SIPA advance, and argues that, in the event that the Trust is found to be entitled to a customer advance, the losses resulting from alleged unauthorized trades of which the Trust complains must be offset by the gains of the Trust from those unauthorized trades which proved profitable. After reviewing both parties' submissions and the relevant case law, and for the reasons hereafter set forth, the Trust's motion for summary judgment is denied.

### BACKGROUND

From 1972 until October 1998, when it ceased operations, the Debtor conducted business as a licensed broker/ dealer, engaged in the purchase, sale and trade of securities on behalf of its clients and itself, with its principal place of business in Chi-

1. Because the issues raised in each motion are identical, this Memorandum Opinion is substantively identical to that issued with respect to the motion for summary judgment on the claim of the Joan Erickson Trust.

cago, Illinois. At such times, the Debtor was a broker member of the Securities Investor Protection Corporation ("SIPC").

Between December 1997 and the time at which the Debtor ceased operations in October, 1998, a number of trades took place which were not formally requested by the Trust. A number, but not all, of these trades form the basis for the Trust's asserted conversion claim for which they seek a SIPA advance.

In or about November 1992, Erickson and his wife Joan Erickson formed the Trust with Erickson appointed as trustee and Joan Erickson as the Trust's beneficiary [2]. In May 1995, Erickson, acting as trustee for the Trust signed, on behalf of the Trust, a set of opening documents and a customer agreement with the Debtor and Bear Stearns Securities Corporation ("Bear Stearns"), the clearing broker.

Between December 1997 and the time at which the Debtor ceased operations in October, 1998, a number of trades took place which had not been formally requested by Erickson on behalf of the Trust. It is a number of these unrequested trades which formed the basis for the Trust's asserted SIPA advance claim for conversion.

On April 13, 1999, upon application by SIPC, the United States District Court for the Northern District of Illinois, entered an order for the liquidation of the Debtor under SIPA; implemented the automatic stay provisions of section 362 of the United States Bankruptcy Code, ("Code") [3]; and referred the matter to this court as though it were a case conducted under provisions of chapter 7 of the Code. In or about June 1999, the Trust filed its claim with the Trustee. On July 5, 2000, the Trustee denied the claim in its entirety on the basis of the failure of Erickson, the Trust's trustee, to object in writing at any time to such trades and the Trust's failure to qualify as a "customer" pursuant to section 78*lll*(3) of SIPA. On August 4, 2000, Erickson, on behalf of the Trust, filed an Opposition to the Trustee's determination on behalf of the Trust. On April 24, 2001, the Trustee submitted an amended determination of that claim to reflect an additional basis for denial of the Trust's claim, namely that Erickson, the trustee for the Trust held approximately 33% of the issued and outstanding shares of the Debtor's preferred stock and would thereby provide further grounds, under § 78fff(3)(a)(4), for a finding that the Trust did not qualify as a "customer."

On May 17, 2001, the Trust filed its motion for summary judgment as to the Trust's claim, arguing that despite the facts alleged by the Trustee, the Trust is entitled to recovery on its claim for a customer advance from SIPC.

### DISCUSSION

 Created under SIPA, SIPC is a federally chartered non-profit corporation which maintains a fund for the protection of investors against losses arising from the insolvency of brokers who are SIPC members. *SIPC v. Oberweis Securities, Inc.*, 1992 WL 119272, *8 (Bankr.N.D.Ill.1992) (Katz, J.) *citing SIPC v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975) [4].

---

**2.** According to the terms of the Trust, Erickson has sole power to "invest and reinvest the trust property in bonds, stocks, mortgages, notes, bank deposits, options and future contracts."

**3.** 11 U.S.C. §§ 101–1330.

**4.** To avoid undue confusion between two separate cases which each bear the title *SIPC v. Oberweis Securities, Inc.*, [*SIPC v. Oberweis Securities, Inc.*, 1992 WL 119272 (Bankr. N.D.Ill.1992) (Katz, J.); and *SIPC v. Oberweis Securities, Inc.*, 135 B.R. 842 (Bankr.N.D.Ill.1991)(Ginsberg, J.)] the court will refer to the appropriate judge.

SIPC does not "step into the shoes" of an insolvent broker / debtor, but rather provides limited cash advances to qualifying "customers" who have suffered such losses. Not all investors' losses qualify for SIPC protection. SIPA explicitly sets forth provisions which create the subset of investors, referred to as "customers" who do qualify for a SIPA advance. The term "customer" is not meant to simply refer to one who buys, sells or trades securities, but rather as a term of art meant to be a "shorthand designation for those eligible ... to receive special protection for their investments." *In re Omni Mut., Inc.*, 193 B.R. 678, 680–81 (S.D.N.Y.1996) *quoting In re Stalvey & Associates, Inc.*, 750 F.2d 464, 468 (5th Cir.1985). Section 78*lll*(3) of SIPA defines such a "customer" as "any person ... who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with collateral security, or for purposes of effecting a transfer. The term 'Customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities." 15 U.S.C. § 78*lll*(2). SIPA advances are made to such customers to compensate for losses occasioned by the insolvency of a SIPC member-broker and are authorized under § 78fff(3)(a)(1) of SIPA. Section 78fff(3)(a)(1) provides, "In order to provide for prompt payment and satisfaction of net equity claims of customers of the debtor, SIPC shall advance to the trustee such moneys, not to exceed $500,000 for each customer, as may be required to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property." 15 U.S.C. § 78fff 3(a)(1). By SIPA's own terms, the avail-

ability of such advances is expressly limited pursuant to § 78fff 3(a)(4), which states:

No advance shall be made by SIPC to the trustee to pay or otherwise satisfy, directly or indirectly, any net equity claim of a customer who is a general partner, officer, or director of the debtor, a beneficial owner of five per centum or more of any class of equity security of the debtor (other than a nonconvertible stock having fixed preferential dividend and liquidation rights) a limited partner with a participation of five per centum or more in the net assets or net profits of the debtor, or a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the debtor.

15 U.S.C. § 78fff 3(a)(4).

■ A customer seeking a SIPA advance, like a creditor asserting a priority claim bears the burden of proof with respect to their status as a customer. *In re Chicago Partnership Board, Inc.*, 237 B.R. 726, 732 (Bankr.N.D.Ill.1999) citing *SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 278 (Bankr.S.D.N.Y.1999).

■ As the basis for its claim, the Trust contends that the Debtor converted funds in excess of $371,000 from the Trust's investment account. Under Illinois law, "conversion" is defined as "any unauthorized act which deprives [a person] of his [or her] property for an indefinite time." *In re Rosin*, 156 Ill.2d 202, 206, 189 Ill. Dec. 400, 620 N.E.2d 368 (1993). The Trust contends that Debtor converted the funds in the Trust's investment account through the use of the Trust's funds for a number of unauthorized purchases of stock shares and stock options.

In opposition to the motion, the Trustee launches three attacks against the Trust's

claim for a customer advance, arguing that the Trust's failure to make a timely objection in writing to trades which it deemed unauthorized in effect ratified the trades in question, thereby preventing assertion of a claim for conversion; arguing that the Trust may not "cherry pick" its claims and finally arguing that Erickson's holdings in the Debtor disqualify the Trust from the category of customers entitled to a recovery of a SIPA advance.

 While there is no separate written-objection requirement specifically set forth under SIPA, courts have generally enforced such provisions of customer agreements requiring that a party objecting to securities transactions as unauthorized, present that objection in writing. As stated by the Second Circuit in *Modern Settings, Inc. v. Prudential–Bache Securities, Inc.*, 936 F.2d 640 (2nd Cir.1991), "The purpose of the ten-day written complaint clause in the customer agreement is to require the customer to memorialize his or her complaint soon after receipt of the account statement rather than waiting to see if the trade is profitable. The writing requirement of the clause insures that unauthorized trading disputes are not relegated to 'swearing contests' between broker and customer. For these reasons, broker-customer agreements requiring written notice of objection within a limited amount of time after the customer receives confirmation of the transaction generally have been enforced by courts." *Modern Settings, Inc.*, 936 at 645–646.

 In or about 1995, the Debtor entered into a clearing agreement with Bear Stearns. Pursuant to that agreement, Bear Stearns prepared and executed account opening agreements with each of the Debtor's customers. The specific language of the customer agreement entered into between the Trust and Bears Stearns provides that "[r]eports of the execution of orders and statements of your account(s) shall be conclusive if not objected to in writing within five days in the case of reports of execution, ten days in the case of account statements, and after such documents have been transmitted to you by mail or otherwise." The agreement further states that "Monthly account statements [sent to each of the Debtor's customers by Bear Stearns] shall be considered accepted and approved by you absent written notice of objection within ten days after receipt."

The Trust argues that "under circumstances such as are present in this case, adherence to the written complaint rule is not required." Rather, according to the Trust, ratification of an unauthorized trade may only be evidenced by a clear demonstration of an actual intent to approve the unauthorized transaction. Trust's Reply Memorandum, p. 10 *citing Drexel Burnham Lambert, Inc. v. Commodity Futures Trading Commission*, 850 F.2d 742, 749 (D.C.Ct.App.1988); *Wing v. Lederer* 77 Ill. App.2d 413, 418, 222 N.E.2d 535 (2nd Dist. 1966). The Trust further argues that Erickson's telephone calls to Peter Cho and attempt to see Mr. Cho to complain about the unauthorized trade should satisfy the requirements of the customer agreements. In *Modern Settings*, however, the Second Circuit reversed a District Court finding that the investor's oral complaints regarding unauthorized trades were sufficient, stating, "Neither of these complaints were in writing as required by the customer agreement." *Modern Settings*, 936 F.2d at 645.

In strictly enforcing the written-complaint requirement, the court in *Modern Settings* did provide a caveat, stating, "There will be instances where a disparity in sophistication between a brokerage firm and its customer will warrant a flexible application of such written notice clauses."

*Modern Settings, Inc.*, 936 F.2d at 646, *citing Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1200 (8th Cir.1982) ("When a customer lacks the skill or experience to interpret confirmation slips, monthly statements or other such documents, courts have generally refused to find that they relieve a broker of liability for its misconduct."). Thus, presently at issue, and related to questions of knowledge and intent, is the question of the sophistication of Erickson. Erickson portrays himself as a rather unsophisticated investor, stating that "Neither Richard nor Joan Erickson had received any formal investment training." Trust's Reply Memorandum, p. 2. In contrast, the Trustee states "During the relevant period, Erickson was a sophisticated and experienced businessman. He received his B.S. in mechanical engineering from Purdue University and in the mid–1960's purchased the Auburn Corporation, a Chicago windows company ... [which he expanded] from a residential windows company with $200,000 in annual income to a commercial windows firm with 30–35 employees and $5 to $7 million in annual income." Trustee's Opposition Memorandum, pp. 3–4. For purposes of a motion for summary judgment, the court must make all permissible factual inferences in favor of the non-moving party. Thus, for purposes of this motion, the court cannot find, as a matter of law, that Erickson lacked sufficient sophistication to understand and interpret the confirmation slips he received to be placed on notice of the written objection requirement.

In its Reply Memorandum the Trust also argues that the Trustee cannot credibly argue that the trades became authorized because the Trustee's counsel stated in a July 21, 1999 letter to Mr. Charles Barbaz, Director of Claims for Frank Crystal & Co., Insurance, that "[f]rom September 25, through October 6, 1998,

Cho apparently effected a series of unauthorized transactions using a number of customer accounts ... None of the fourteen Dawson customers had authorized Cho to effectuate such trades on their behalf." Trust's Reply Memorandum, Ex. C. While the Trustee objects to the inclusion of this letter in the Reply memorandum, it is not dispositive of the issue of authorization. Making all factual inferences in favor of the non-moving party as this court is required to do on motions for summary judgment, it is possible that each of these trades were unauthorized at the time they were made but became authorized by failure to make a timely written objection as required by the customer agreement.

Having found that the Trust is not entitled to summary judgment, the court will not now address the issues with respect to the share holdings of Erickson in the Debtor.

 Bearing present attention, however, is the issue of what is colloquially referred to as the "cherry picking" of unauthorized trades. In the securities arena, the so-called netting theory is often rejected because "If we were to adopt [the netting theory] view, securities brokers would be free to churn their customers' accounts with impunity so long as the net value of the account did not fall below the amount originally invested. Churning is not excused by the fact that the account realizes new profit." Trust's Reply Memorandum, *citing Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206, 1218 (8th Cir.1990) (involving alleged violations of § 10(b) of the Securities Exchange Act, common-law fraud and breaches of fiduciary duty by stockbroker). While the facts involved alleged wrongdoings by the Trust's stockbroker, here any SIPA cus-

tomer advance would be paid by SIPC.[5] As stated previously, SIPA makes it clear that SIPC does not protect against every customer loss. "Only the amount that the broker would have owed each customer had it liquidated all the customer's holdings on the date the SIPC filed the SIPA proceeding is protected by the SIPC fund." *SIPC v. Oberweis Securities, Inc.,* 135 B.R. 842 (Bankr.N.D.Ill.1991) (Ginsberg, J.). Judge Ginsberg, in *Oberweis Securities,* instructed that "the value of the account, which is the measure of the customer's SIPA claim is its 'net equity', computed by taking the dollar amount of funds in the account ... deducting any indebtedness and other obligations owed by the customer to the broker and by giving effect to certain open contractual commitments ... Thus, only a customer's net equity is protected by the SIPC insurance fund." *Id.* at 846. Further, according to Judge Ginsberg "claims based on fraud or breach of contract are not considered part of a customer's protected net equity claim." *In re Oberweis Securities,* 135 B.R. at 846. This court agrees with Judge Ginsberg's analysis. It is consistent with the intended purpose of SIPA and the customer claim process to protect investors only from losses occasioned directly by the insolvency of the broker-dealer.

Judge Ginsberg's *Oberweis Securities* case involved two investors who entrusted their account representative with an amount in excess of $28,000.00 with explicit instructions to invest the funds in a money market mutual fund. Their account representative allegedly failed to complete this task, but rather kept the money in contravention of the investors instructions. Judge Ginsberg denied the SIPA customer advance claim of the investors for the amount of dividends which they would have received had their money been invested as instructed. Finding that this damage would have occurred even if the debtor had not become insolvent, Judge Ginsberg held that "this claim is not within the purview of what SIPA seeks to protect since the loss is not the direct result of the debtor's insolvency." *Oberweis Securities, Inc.,* 135 B.R. at 846. Judge Ginsberg, in the *Oberweis* case made it clear that this did not mean that the investors were left without a valid claim, but rather that they properly held an unsecured claim against the Debtor which was not covered by SIPA.

While outside of the SIPA context, other courts have allowed so-called "cherry picking" among unauthorized trades; within the SIPA context, a decision to allow the investor to retain the benefits of every profitable unauthorized trade while forcing SIPC, a third party without involvement in any alleged wrongdoing, to insure and compensate such an investor for any unauthorized trade which proved unprofitable would run contrary to the stated purposes of SIPA.

While neither party has fully briefed the issues raised in the *Oberweis Securities* case, it is clear to the court that the Trust is not entitled to judgment as a matter of law with respect to its claim for a SIPA advance.

For the reasons set forth herein, the Trust's motion for summary judgment is denied.

---

**5.** The court takes no position at this time on whether the "netting theory" would apply in the event that the Trust's claim is recharacter- ized as an unsecured claim against the Debtor.